**ERIE INSURANCE GROUP, Plaintiff,**

**v.**

**ALLIANCE ENVIRONMENTAL, INC., Alliance Indiana, Inc., Alliance Illinois, Inc., R. Bruce Wallace, Sear Corporation, Larry Bass, and Birch Dalton, Defendants.**

**No. IP 94–2076–C H/G.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

March 4, 1996.

John C. Trimble, Lewis & Wagner, Indianapolis, Indiana, for plaintiff.

Thomas E. Farrell, Scopelitis, Garvin, Light & Hanson, for Alliance defendants.

Richard A. Cook, Skiles & Reed, Indianapolis, Indiana, for defendants Wallace, Sear Corporation, Bass, and Dalton.

### ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT

HAMILTON, District Judge.

This case presents several questions of Indiana law about the scope of liability insurance coverage under a business's general liability insurance policy. Several of the defendants in this case—Sear Corporation and two of its officers, Larry Bass and Birch Dalton (collectively, the "Sear defendants")—have filed suit in state court for defamation and tortious interference with contract against the "Alliance defendants"—Alliance Environmental, Inc., Alliance Indiana, Inc., Alliance Illinois, Inc., and Bruce Wallace, who is president and chief operating officer of each those corporations. The Alliance defendants submitted a claim for defense and

coverage to their general liability insurance carrier, Erie Insurance Group ("Erie"), which is the plaintiff here. Erie denied the claim and seeks a declaratory judgment that it has no duty to defend or indemnify the Alliance defendants for any of the claims asserted against them by the Sear defendants in the underlying suit. This court has subject matter jurisdiction based on diversity of citizenship, and there is a ripe controversy between the parties.

All parties have moved for summary judgment and agree that Indiana law governs the insurance policy at issue here. Erie argues that the "personal injury" liability coverage provided in the policy it issued to the Alliance defendants excludes coverage for damages arising out of "services of a professional nature." The Alliance defendants and the Sear defendants argue that Erie is obligated to provide coverage because the underlying lawsuit asserts claims beyond the scope of the professional services exclusion. Both sets of defendants also contend that the policy's "advertising injury" liability coverage applies even if the professional services exclusion also applies to bar personal injury liability coverage. As explained below, the court concludes that the Erie policy does not apply because the Sear defendants seek to hold the Alliance defendants liable for actions taken in providing professional services and because the Alliance defendants' actions were not "in the course of advertising" their services. The court therefore grants Erie's motion for summary judgment and denies the Alliance defendants' and Sear defendants' motions for summary judgment.

### Summary Judgment Standard and Applicable Indiana Insurance Law

 Summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to find in favor of the non-moving party on the particular issue. *E.g., Methodist Medical Center v. American Medical Security, Inc.,* 38 F.3d 316, 319 (7th Cir.1994). Interpretation of a written contract, such as a contract of insurance, is ordinarily a question of law suitable for resolution on motions for summary judgment. *E.g., Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992); *Wayne Township Bd. of Sch. Comm'rs v. Indiana Ins. Co.,* 650 N.E.2d 1205, 1208 (Ind.App. 1995); accord, *Hurst–Rosche Engineers, Inc. v. Commercial Union Ins. Co.,* 51 F.3d 1336, 1342 (7th Cir.1995) (affirming summary judgment applying Illinois law and holding that professional services exclusion applied to bar coverage for claims of libel and tortious interference with contract). When the question presented is whether an insurance policy provides liability coverage for a particular claim or lawsuit, the central material facts are ordinarily the terms of the written contract and the contents of the plaintiff's allegations in the underlying litigation. *E.g., Wayne Township Bd. of Sch. Comm'rs,* 650 N.E.2d at 1208 (if pleadings in underlying suit show that claim is clearly precluded under terms of policy, insurance company is not required to defend or provide coverage for insurer). Both sets of facts will ordinarily not be disputed, and they are not disputed here. The parties disagree about the legal conclusions to be drawn from the terms of insurance contract as applied to the underlying lawsuit.

 Indiana law governs the interpretation of the Erie policy, so the task for this court is to decide issues of Indiana law as the court believes the Supreme Court of Indiana would decide them. Under Indiana law, words in an insurance policy should be given their plain and ordinary meaning whenever possible. See *Tate,* 587 N.E.2d at 668; *Cincinnati Ins. Co. v. Flanders Electric Motor Service Inc.,* 40 F.3d 146, 151 (7th Cir.1994). Generally, ambiguous language in an insurance contract must be construed in favor of the insured, and language is ambiguous if reasonable persons may honestly differ as to its meaning. *Eli Lilly & Co. v. Home Ins. Co.,* 482 N.E.2d 467, 470 (Ind.1985); *Cincinnati Ins. Co. v. Flanders Electric Motor Service Inc.,* 40 F.3d at 151. Exclusionary provisions in insurance contracts are subject to this principle. As one Indiana court has said: "An exclusion will be given effect only if it unmistakably brings the act or omission

within its scope." *Evans v. National Life Accident Ins. Co.,* 467 N.E.2d 1216, 1219 (Ind.App.1984). See also *American National Fire Ins. Co. v. Rose Acre Farms, Inc.,* 846 F.Supp. 731, 736 (S.D.Ind.1994) (citing *Evans* among other cases); *Indiana Ins. Cos. v. Granite State Ins. Co.,* 689 F.Supp. 1549, 1557 (S.D.Ind.1988) (citing *Evans*).

■■■ Indiana's interpretation rule about ambiguity in both coverage and exclusion provisions should not be taken to its extreme. An insurance company cannot be held to a standard of clarity requiring it to have anticipated every factual situation that possibly could arise and to have expressly addressed how the policy would apply to all of those situations. *Harnischfeger Corp. v. Harbor Ins. Co.,* 927 F.2d 974, 976 (7th Cir.1991) (explaining attempt to cope with all possible interactions of fact and text would produce incomprehensible and expensive policy "more like a federal procurement manual than like a traditional insurance policy"). The ambiguity rule works in default to break a genuine tie but does not dictate that all conflicts be resolved against the drafter. *Id.* ("There must be genuine (meaning, substantial) uncertainty, not resolvable by other means, and the insured's proposed reading must be reasonable.").

## Undisputed Facts

This dispute arose after asbestos was discovered at Jefferson High School in Lafayette, Indiana. Because the allegations in the complaint ordinarily govern the scope of the insurer's duty to defend and indemnify, the central facts here are actually the allegations in the Sear defendants' complaint against the Alliance defendants in state court. (As far as this court is aware, the truth of the material allegations is hotly disputed in that action, but this court must focus on the allegations for purposes of deciding this case.) In 1991, the Lafayette School Corporation contracted with Sear Corporation to remove the asbestos. Sear Corporation removed asbestos between September 5, 1991, and November 27, 1991. The school corporation then allegedly discovered asbestos remaining at the high school in areas where Sear had worked. The school corporation contracted with Star Environmental, Inc. to remove the additional asbestos. Star completed that work in the summer of 1992.

The school corporation also hired the Alliance companies in August 1992 to "inspect and investigate the source and responsibility for the [asbestos] materials" at the high school. Sear Cplt. ¶ 19. After completing their investigation, the Alliance defendants (through Wallace) reported their findings to the school corporation, the Indiana Department of Environmental Management, and "others." The Alliance defendants' findings were that Sear failed to remove all of the asbestos at the high school, and that Sear negligently committed "civil and criminal violations in failing to do so." [1] The Sear defendants allege that, as a result of the actions of the Alliance defendants and others, Sear Corporation lost its license as an asbestos contractor with the State of Indiana, but later regained its license.

The school corporation brought suit against the Sear defendants in Tippecanoe Circuit Court for failing to remove all the asbestos at the school. The Sear defendants filed a third party complaint against the Alliance defendants and others for tortious interference with a contractual relationship, defamation, and civil rights violations. The Alliance defendants submitted a claim to Erie for coverage under the liability policy. Erie denied the Alliance defendants' claim and filed this lawsuit to obtain a declaratory judgment that its policy provides no coverage here.

The Erie insurance policy at issue (Policy No. Q40 0750196 R, in effect from April 7, 1992, to April 7, 1993), covers Alliance Environmental, Inc., Alliance Indiana, Inc., Alliance Illinois, Inc., and their officers and directors acting within the scope of their employment. The policy includes casualty protection for the Alliance defendants' business property and business income. The policy also includes liability protection for

---

1. The record contains copies of some written reports by Wallace as well as numerous newspaper articles about the general controversy concerning asbestos at the high school and the efforts to correct the problem.

personal injury or property damage. The term "personal injury" is defined to include injury arising out of libel, slander, and defamation of character. The policy contains an exclusion that lies at the heart of this case. It provides that the policy does not cover "personal injury" damages "due to ... any service of a professional nature, including but not limited to (1) the preparation or approval of maps, plans, opinions, reports, surveys, designs, or specifications and (2) supervisory, inspection or engineering services."

The Erie insurance policy separately covers "advertising injury." The policy defines "advertising injury" in part as injury arising out of "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." The operative coverage provision includes this limitation: "We cover only advertising injury caused by an offense committed during the policy period and in the course of advertising your goods, products or services and which takes place in the covered territory." The exclusions portion of the policy does not include a professional services exclusion applicable to advertising injury.

### Professional Services Exclusion to Personal Injury Liability Coverage

The Erie policy in this case is not the type of policy known as an "errors and omissions" policy or a professional malpractice policy. It is instead a general business liability policy that expressly excludes coverage for liability for "damages due to (e) any service of a professional nature, including but not limited to: (1) the preparation or approval of maps, plans, opinions, reports, surveys, designs, or specifications and (2) supervisory, inspection or engineering services." The difference between the two types of policies is important in terms of what the parties to the insurance contract believe they are buying and selling. Where the entity buying a general liability policy is in the business of providing professional services (such as legal advice, medical treatment, or engineering services, as in this case), there is some room for confusion, overlap, and controversy. The precise issue is thus what scope to give the phrase "due to service of a professional nature."

### A. Scope based on identity of plaintiff or type of legal claim

The parties agree that the Alliance defendants provided some professional services to the Lafayette School Corporation and that the professional services exclusion would apply if the underlying suit had been brought by the school corporation against Alliance for professional malpractice. The elements of that hypothetical situation that lead to agreement regarding the exclusion's application are the identity of the plaintiff bringing the underlying suit and the nature of the legal claim being brought. The Alliance and Sear defendants argue that the exclusion's applicability is limited by one or both of these two factors and that the exclusion does not apply to claims brought by third parties and characterized as general torts.

First, the Alliance and Sear defendants argue that the professional services exclusion applies only to so-called "first party" claims, *i.e.*, claims by someone to whom the Alliance defendants provided their professional services directly, such as the school corporation in this case. The few Indiana cases dealing with professional services exclusions have involved first party claims. See *Terre Haute First National Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336 (Ind.App.1993) (professional services exclusion barred coverage where insured bank had been sued by person for whom the bank was acting as a guardian); *Collins v. Covenant Mut. Ins. Co.*, 604 N.E.2d 1190 (Ind. App.1992) (professional services exclusion barred coverage on claims that physician acted negligently in entering into sexual relationship with patient and impregnating her), *vacated on other grounds*, 644 N.E.2d 116 (Ind.1993); *Norways Sanatorium, Inc., v. Hartford Accident & Indemnity Co.*, 112 Ind. App. 241, 41 N.E.2d 823 (1942) (professional services exclusion did not bar coverage where insured sanatorium was sued for negligence by patient whose injuries could have resulted either from negligence in professional services or from ordinary negligence in maintaining premises).

Nothing in the language of the professional services exclusion here or in the reasoning of those cases limits the exclusion to claims brought by the clients of the professional, *i.e.*, to first party claims. The exclusion here applies to damages or liability "due to any service of a professional nature" and does not require privity between the insured and the claimant. In addition, cases from the Seventh Circuit and Third Circuit have applied professional service exclusions to claims by others, called "third party" claims. See *Hurst–Rosche Engineers, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336 (7th Cir. 1995) (under Illinois law, exclusion applied to claims that insured engineering firm's inspection report defamed and tortiously interfered with contract of general contractor on the construction project); *Harad v. Aetna Casualty & Surety Co.*, 839 F.2d 979, 983–85 (3d Cir.1988) (exclusion applied where insured attorney was sued for malicious prosecution by party against whom he had filed verified answer and counterclaim on behalf of his client). In *Harad* the Third Circuit expressly rejected an argument that the exclusion applied only to claims by clients or those in privity with insured. The fact that the Sear defendants, rather than the school corporation, filed the underlying claims against the Alliance defendants does not alone bar application of the professional services exclusion in the Erie policy.

■ The Alliance and Sear defendants next argue that the professional services exclusion applies only to claims based on alleged breaches of specific duties uniquely owed by professionals. They cite two cases employing this "type of claim" test to limit professional services exclusions. See *Treadway v. Vaughn*, 633 So.2d 626, 629 (La.App. 1993) (professional services exclusion held not applicable where complaint against insured lawyer in underlying suit could be read as alleging breach of general duty not to defame others, rather than breach of duty

arising strictly out of insured's profession); *Gregoire v. AFB Construction, Inc.*, 478 So.2d 538, 541 (La.App.1985) (scope of professional services exclusion left to finder of fact where complaint against insured "could be construed to include the breach of the general duty of reasonable care" and such a duty "could be found to be outside the 'professional' or 'supervisory' services" the insured agreed to perform).

The language in the Erie policy—"damages due to any service of a professional nature"—cannot be limited to claims alleging breaches of duties imposed by law only upon someone acting as a professional. This professional services exclusion is framed in terms of the services or activities that give rise to the liability, not in terms of the legal theory articulated by the plaintiff. See *Hurst–Rosche Engineers, Inc. v. Commercial Union Ins. Co.*, 51 F.3d at 1344 (interpreting professional services exclusion under Illinois law, coverage should not hinge exclusively on the drafting skills or whims of the plaintiff; coverage depends on "what misconduct is alleged").[2] Thus the fact that Sear alleged claims such as defamation that involve breaches of general duties does not alone bar application of the professional services exclusion in the Erie policy.

**B. Scope based on nature of acts**

■ The scope of the professional services exclusion in the Erie policy must be determined from the nature of the allegedly wrongful actions rather than from the identity of the claimant or the legal theories the claimant chooses to articulate. In drawing boundaries between alleged wrongs that are within or without the scope of the professional services exclusion, the court must recognize the fact that there are different insurance policies on the market for different purposes. A professional services exclusion

2. A wide range of legal theories may be available to plaintiffs who believe they have been injured by the actions of professional who was providing professional services. Depending on the circumstances and the profession involved, a plaintiff could plead claims for general negligence, failure to comply with the applicable profession's standard of reasonable care, defamation, tortious interference with contract, fraud, constructive fraud, negligent or intentional infliction of emotional distress, and so on. Yet perhaps only claims for constructive fraud and failure to comply with a professional standard of care would allege breaches of duties specific to the professional nature of the services provided.

in a general business liability policy cannot be read so broadly as to exclude liability for any act at all taken in the course of providing professional services. Such a broad reading would exclude coverage, for example, for an automobile accident caused by an Alliance officer traveling from one professional meeting to another, or for negligent injury to a client visiting an Alliance office. The general liability policy here was quite clearly intended to cover such risks. At the same time, a professional services exclusion also should not be read so narrowly as to transform a general business liability policy into a professional errors and omissions policy. As explained below, the focus must be on whether the claimant is seeking to impose liability for acts which were taken in the course of providing professional services and which drew upon (or at least should have drawn upon) the professional's training, skill, experience, or knowledge.

The Alliance and Sear defendants argue that the professional services exclusion should not apply because the underlying suit is based on alleged conduct that was not inherently professional in nature and that was outside the scope of the Alliance defendants' contractual obligations to the school corporation. These closely related concepts come from case law in Indiana and other jurisdictions wrestling with similar coverage problems.

Some courts have dealt with the problem in terms of whether the alleged wrongful acts were inherently professional. For example, in *Norways Sanatorium, Inc. v. Hartford Accident & Indemnity Co.*, 112 Ind.App. 241, 41 N.E.2d 823 (1942), a patient sued the insured sanatorium for injuries he suffered when, while mentally incapable of caring for himself, he jumped or fell from an unguarded second-story window. The court held that a professional services exclusion did not apply and that the sanatorium was entitled to coverage. It reasoned that the alleged negligence in the underlying suit did not necessarily involve a professional act or omission because the sanatorium might have failed to act through officers who were not physicians or nurses. 41 N.E.2d at 824–25. See also *Guaranty Nat'l Ins. Co. v. North River Ins.*

*Co.*, 909 F.2d 133, 136–37 (5th Cir.1990) (hospital decided as a matter of professional judgment to protect psychiatric patients from jumping out of windows in unit; liability damages stemming from failure in method—ineffective screws in window sashes rather than fixed, protective screens over windows—did not fall under professional services exclusion because decision as to method was "administrative, business" decision); *Big Town Nursing Homes, Inc. v. Reserve Ins. Co.*, 492 F.2d 523, 525 (5th Cir.1974) (professional services policy covered liability due to nurses' restraint of "irrational" alcoholic patient in hospital, done pursuant to hospital policy, because restraint was not "a purely physical action in response to a business determination but rather [was] the exercise of a trained nursing judgment in obedience to an established medical policy").

Conversely, in *Terre Haute First National Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336 (Ind.App.1993), the insured bank had been sued for breach of its fiduciary duty as a guardian to protect the assets and interests of a customer. The Indiana court relied on reasoning in a similar Illinois case that "the bank customer's claim arose from the bank['s] exercise of its business judgment in conducting its principal business activity and was not in any way directly related to the bank's ownership or operation of its building," seemingly the object of protection under the "office building policy" at issue. 634 N.E.2d at 1339 n. 2, citing *State Street Bank and Trust Co. v. INA Ins. Co.*, 207 Ill.App.3d 961, 153 Ill.Dec. 327, 332, 567 N.E.2d 42, 47 (1991). The Indiana court concluded: "[T]he Bank's claim of right to a defense arises from allegations that it failed to render adequately a professional service to a Bank customer. The Bank is seeking defense of a typical errors and omissions claim, a claim not properly brought, and excluded, under the policy at issue in this case." 634 N.E.2d at 1339.

The Third Circuit similarly based its decision in *Harad v. Aetna Casualty & Surety Co.*, 839 F.2d 979 (3d Cir.1988), on the inherently professional nature of the acts alleged in the underlying suit. There the insured attorney had been sued for malicious prose-

cution by a litigant against whom the attorney had pursued certain claims. The Third Circuit held that a professional services exclusion applied to bar coverage because the attorney had needed his professional skills and legal certification to perform the acts at issue in the underlying case—signing a verified answer and counterclaim. *Id.* at 984–85. In deciding the scope of the professional services exclusion, the Third Circuit drew a distinction between professional liability and more general business or commercial liability:

> The professional aspect of a law practice obviously involves the rendering of legal advice to and advocacy on behalf of clients for which the attorney is held to a certain minimum professional and ethical standards [sic]. The commercial aspect involves the setting up and running of a business, i.e., securing office space, hiring staff, paying bills and collecting on accounts receivable, etc., in which capacity the attorney acting as businessperson is held to the same reasonable person standard as any other. Indeed, the professional services and the business distinction drawn by the two policies and Harad's recognition of the limitations inherent in each is manifested by the fact that Harad purchased a separate professional liability policy from Home.

> Given the dual nature of the practice of law, an attorney's liability for an action should be assessed depending on the particular role he was performing at the time the alleged liability arose. For example, if an attorney, while hosting a real estate closing in his office, places his briefcase on the floor and a colleague trips on it, is injured and sues him, the lawyer's liability would derive not from the rendering of a professional service, but rather from his operation of a business. Conversely, since Harad's conduct in this case was not related to his operation of a business, but was derived solely from his providing legal ser-

vices to a client, his liability is professional in nature.

839 F.2d at 985.[3]

*Norways Sanatorium, Terre Haute First National Bank,* and *Harad* all interpreted professional services exclusions to more general liability policies. The court in *Albert J. Schiff Associates, Inc. v. Flack,* 51 N.Y.2d 692, 435 N.Y.S.2d 972, 975–76, 417 N.E.2d 84, 87–88 (1980), also used the test of whether an act was "inherently professional" in addressing a policy that covered liability for professional errors and omissions. The Court of Appeals of New York held the policy did not cover claims that the insured had misappropriated a trade secret, explaining:

> The renting of an office, the engagement of employees, arrangements to expand the size of one's activities, these may all have some connection with a covered business or profession. But, while they may set the stage for the performance of business or professional activities, they are not the professional activities contemplated by this special coverage. An errors and omissions policy is intended to insure a member of a designated calling against liability arising out of the mistakes inherent in the practice of that particular profession or business (see *Grieb v. Citizens Cas. Co.,* 33 Wis.2d 552, 148 N.W.2d 103). After all, the plaintiff's policy here was neither a standard general liability policy nor a standard general liability policy with a contractual liability indorsement. Nor was it one comprehensive enough to protect against all business vicissitudes. To hold otherwise, on a fair reading of the policies, would be to create additional coverage beyond that which was bought and paid for.

435 N.Y.S.2d at 976, 417 N.E.2d at 88.

Other courts have looked more closely at the precise terms of the particular professional service contract involved. In several cases involving construction projects and engineering firms, courts have examined the scope of the engineering firm's professional

---

**3.** Judge Sloviter dissented in *Harad,* arguing that when an insurer issues a business liability policy (that includes coverage for malicious prosecution) to a business that is a professional law practice, the exclusion for "professional service" is at least ambiguous. Judge Sloviter would have imposed on the insurer the obligation to clarify the scope of coverage more explicitly. 839 F.2d at 985–86.

services contract to determine whether the underlying claim alleges a failure in performing the contract. See *Fidelity & Casualty Co. v. Envirodyne Engineers, Inc.,* 122 Ill. App.3d 301, 77 Ill.Dec. 848, 461 N.E.2d 471 (1983) (exclusion applied because insured was sued for negligent supervision and inspection of a construction site, which was the "professional service" it was hired to perform as consulting engineer); *Sheppard, Morgan & Schwaab, Inc. v. United States Fidelity & Guaranty Co.,* 44 Ill.App.3d 481, 3 Ill.Dec. 138, 358 N.E.2d 305 (1976) (exclusion applied because insured engineering firm was sued for failure to properly supervise construction of sewers, the job it contracted to perform); *Womack v. Travelers Ins. Co.,* 251 So.2d 463 (La.App.1971) (exclusion applied because insured engineering firm was sued for failing to properly identify location of buried pipeline in relation to a road construction project where that duty was within scope of contractual duties). But see *Aetna Fire Underwriters Ins. Co. v. Southwestern Engineering Co.,* 626 S.W.2d 99, 101–02 (Tex.App.1981) (exclusion did not apply where insured engineer was sued for failing to pre-identify the location of a buried pipeline and nothing in service contract to design expansion of telephone system expressly authorized or obligated engineer to locate underground pipelines).

The Seventh Circuit's decision in *Hurst–Rosche Engineers, Inc. v. Commercial Union Ins. Co.,* 51 F.3d 1336, deals with facts strikingly similar to this case. In that case a public agency (a housing authority) contracted with a construction company to act as general contractor on a building project. The housing authority also contracted with an engineering firm to inspect the construction company's work. The general manager of the engineering firm wrote a letter to the company that had issued the performance bond for the construction company's work. The letter was highly critical of the construction company's work on the project. The construction company then sued the engineering firm for, among other things, defamation and tortious interference with contract. The engineering firm tendered the claim to its liability insurers, and two insurers whose policies contained professional services exclusions declined coverage. The district court granted summary judgment to the insurers and the Seventh Circuit affirmed. 51 F.3d at 1343–45. The Seventh Circuit based its decision on the fact that the engineering firm's letter was written in the course of its professional services. The court refused to base a decision on the engineering firm's unsupported suggestion that the construction company was alleging actions of "a rogue employee who absconded with company stationery to write and deliver a defamatory letter in vindication of some personal grievance." *Id.* at 1344. The Seventh Circuit held that the professional services exclusions applied. *Id.* at 1344–45.

The Indiana courts provided some additional guidance with respect to this problem in *Collins v. Covenant Mut. Ins. Co.,* 604 N.E.2d 1190 (Ind.App.1992), *vacated on grounds not relevant here,* 644 N.E.2d 116 (Ind.1994). In *Collins* a woman sued her physician for negligence in providing medical services on four grounds: (1) entering into a sexual relationship with her; (2) impregnating her while she was his patient; (3) telling her she was not pregnant when in fact she was; and (4) injuring her with a medical instrument during a vaginal examination, then leaving her unattended, without treating that injury.[4] The physician carried professional liability insurance covering damages for "error, omission, or negligence in providing health care services...." The Indiana Court of Appeals held that the policy covered the claims for erroneously telling the patient that she was not pregnant and for injuring her and failing to treat her properly, but that the claims based upon the sexual relationship and pregnancy itself fell outside the scope of the policy. 604 N.E.2d at 1195–97. In examining the patient to determine whether she was pregnant, incorrectly telling her she was not, injuring her in the course of the examination, and neglecting to treat the wound he inflicted in the examination, the

4. The physician was convicted on criminal charges arising from his conduct toward this and other patients. 604 N.E.2d at 1192.

physician was exercising, for better or worse, his professional training and experience. (The court of appeals recognized that a sexual relationship with a patient might fall within the scope of professional service liability coverage where the claim was based on transference in psychotherapy, but outside that context, the court rejected the claim that such a relationship and its consequences were within the scope of the insurance coverage. *Id.* at 1196–97.) Thus, *Collins* shows that not every action a professional takes in the course of providing professional services will be a professional service for insurance purposes, but that when the professional draws upon (or at least *should* draw upon) his or her professional knowledge, experience, and training in taking some action, that is a professional service for insurance purposes. See also *Imperial Cas. & Indem. Co. v. Home Ins. Co.*, 727 F.Supp. 917, 919 (M.D.Pa.) (professional services exclusion would apply to prison nurse and guard's alleged failure to provide adequate medical care, but did not apply to allegations that prison officials merely failed to communicate medical complaints to medical staff), *aff'd mem.*, 909 F.2d 1476 (3d Cir.1990).

■ The nature of the Alliance defendants' acts at issue must be examined against this background of case law. The complaint in the underlying suit alleges that the Alliance defendants were retained by the Lafayette School Corporation "to inspect and investigate the source and responsibility for the materials found inside" Jefferson High School. In one of the most important communications at issue in the underlying suit, Bruce Wallace, the President and CEO of Alliance, wrote to an official at the Indiana Department of Environmental Management (IDEM). He introduced several paragraphs with the phrase "it is the professional environmental and safety engineering opinion of Alliance Environmental Inc. that . . . ." See Exhibit A attached to "Plaintiff's Reply in Support of Summary Judgment and Response in Opposition to Cross–Motion for Summary Judgment by Sear" (hereinafter, "IDEM letter"), at page 2, ¶¶ 1–4, 8. As Erie asserts, any liability stemming from the statements in those paragraphs clearly would be "due to services of a professional nature."

However, Wallace also made additional observations about Sear based on information that he presumably acquired before his specific investigation of asbestos problems at Jefferson High School. See IDEM letter, at pages 3–4. He wrote, for example:

I have been made aware that Sear projects typically used untrained, unskilled workers with forged training documentation. They apparently have had a long history of federal and state asbestos work practice violations and safety orders. In my personal dealings with Sear, their general attitude towards regulatory compliance has been poor, to say the least. Sear has worked on several bidded school projects which Alliance has designed and where Alliance was the project manager, over the past four years. As President of Alliance, my experiences with the Sear performance on asbestos abatement projects has [sic] not been good. Their work practices were nothing short of deplorable, their workers undependable and their compliance efforts were non-existent.

Sear also has been noted by their own employees as not paying the full prevailing wage to all workers. . . . [K]nowing the owners of Sear as I do, I would suspect that an investigation of their labor records would reveal significant legal problems with their payroll records as well as their accounting practices.

IDEM Letter, at page 4. The parties also have submitted to the court copies of other written communications and copies of newspaper articles at issue in the underlying suit.

All of the allegedly defamatory communications identified to the court are clearly communications that Mr. Wallace made in the course of providing his professional services for the school corporation, at least in the sense that he would not have made them but for the contract with the school corporation to inspect and report on the work done by the Sear defendants. The Alliance and Sear defendants argue, however, that at least some of these communications went beyond the scope of the professional service contract and were not essential parts of the profes-

sional services provided to the school corporation.

■ The Alliance and Sear defendants are essentially asking this court to hold that the Seventh Circuit's decision in *Hurst–Rosche Engineers* is limited to liability for actions expressly requested in and/or indispensable to a professional services contract. See 51 F.3d at 1343–45. That decision invites no such limitation, and the Indiana Court of Appeals decision in *Collins v. Covenant Mutual Insurance* also counsels against such a limitation. The case law in this area, and particularly *Hurst–Rosche Engineers* and *Collins,* indicates that where the insured is being sued for taking actions in the course of providing professional services, and where those actions both are reasonably related to the services being provided and involve the use of (or failure to use) professional knowledge, skill, experience, or training, the "professional services" exclusion applies. Under this standard, potential liability for the communications made in connection with the Alliance defendants' investigation must be considered "due to ... any service of a professional nature" so that the exclusion in the Erie policy applies.

The Erie exclusion for professional services refers specifically to preparing opinions and reports. The statements before the court were either framed expressly as "professional opinions" or were made in the same reports as those "professional opinions." The statements in dispute were included as part of the reports of the results of the professional investigation that Alliance was hired to conduct. They provided information about the company and individuals who were subjects of the investigation. They provided information that was plainly relevant to the investigation and report. A client like the school corporation contracts for "professional" services in order to benefit from the special skill, training, and judgment of the professional. Even if the school corporation had not expressly requested Wallace to consider other sources of information about the Sear defendants, as a professional's client it surely would have had a right to expect Wallace to provide it with relevant information available to him from other sources, including his own past experience and personal knowledge.

In light of these circumstances, the statements in dispute here, although not *expressly* called for, were made in the course of providing professional services to the school corporation, were reasonably related to the services provided, and involved the use of professional experience, skill, judgment, or knowledge. Any damages stemming from the statements in dispute here would be "due to" professional services. See also *USM Corp. v. First State Ins. Co.,* 420 Mass. 865, 652 N.E.2d 613, 614–15 (1995) (because it was "reasonable within its professional responsibilities" for consultant to make express warranty that arguably exceeded normal obligations of consultant to client, losses incurred as result were "in the conduct as its business ... and in the rendering of professional services"). Reporting the same information to IDEM and to others (including reporters) on a matter of significant public interest in Lafayette was also sufficiently within the scope of the Alliance defendants' professional work for the exclusion to apply. The personal injury liability coverage of the Erie policy does not cover the Alliance defendants' potential liability in the underlying suit brought by the Sear defendants. If the Alliance defendants wanted such coverage, they needed to buy a professional errors and omissions policy.[5]

### Advertising Injury Coverage

■ The Alliance defendants' insurance policy from Erie separately provides cover-

---

5. The record includes part of a letter from Mr. Wallace to an Erie claims adjuster dated September 14, 1994. The Alliance defendants assert that Wallace wrote that the allegations in the Sear defendants' complaint "are just the type for which we purchased insurance coverage" and "are just the type for which we are covered in the policy." The cited page of the Wallace letter is not contained in the court's copy of the letter (which is an exhibit to Erie's original brief). In any event, Mr. Wallace's subjective expectations expressed after the coverage controversy arose are not material and do not raise a triable issue of material fact. As explained above, it was not reasonable for Mr. Wallace to expect coverage because the professional services exclusion unmistakably brings the alleged acts within its scope.

age for some advertising injury, and this coverage is not subject to the professional services exclusion. The policy defines "advertising injury" in relevant part as injury arising out of "oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Although Erie argues there was no "publication of material," the Sear defendants' allegations in the underlying lawsuit clearly allege "publication" in the sense ordinarily required for a defamation claim. The Sear defendants also allege that the material defamed them and disparaged their services. The Sear defendants' allegations therefore fall within the policy's definition of "advertising injury."

That conclusion does not resolve the advertising injury issue, however. The other dispute here concerns limiting language in the coverage provision of the policy, which states: "We cover only advertising injury caused by an offense committed during the policy period and in the course of advertising your goods, products or services and which takes place in the covered territory." Erie argues that the alleged defamatory statements were not made "in the course of advertising" the Alliance defendants' services. The Alliance and Sear defendants argue the coverage applies because Sear contends in the underlying lawsuit that the Alliance defendants made defamatory statements about Sear for the purpose of obtaining more business for themselves. The Sear defendants' complaint itself makes no such allegation. After the insurance coverage issue arose, however, the Sear defendants asserted in interrogatory answers about the basis for their punitive damages claims that they "believe that Bruce Wallace was primarily motivated by greed. In other words, he intentionally, recklessly, maliciously, and falsely discredited Micro Air and SEAR Corporation in order to obtain work from LSC."

The issue then is whether, for the purposes here of indemnification and defense, the underlying suit alleges defamation "in the course of advertising [the Alliance defendants'] goods, products or services." In *Sentry Ins. v. R.J. Weber Co.*, 2 F.3d 554 (5th Cir.1993), the Fifth Circuit applied Texas law in considering a virtually identical advertising injury provision in a liability policy. In that case, a competitor of the insured sued the insured for alleged copyright infringement. The policy included copyright infringement in the definition of advertising injury (as does the Erie policy here), but the insurer argued there was no indication that the alleged copyright infringement occurred "in the course of advertising" the insured's products. The Fifth Circuit agreed, finding that the insured was required to demonstrate some connection between its advertising activity and the plaintiff's claim against the insured. 2 F.3d at 557. Accord, *National Union Fire Ins. Co. v. Siliconix, Inc.*, 729 F.Supp. 77, 79–81 (N.D.Cal.1989) (although insured had advertised product that allegedly infringed a patent, suit for patent infringement did not allege a wrong "in the course of [insured's] advertising activities"). No such connection between the Sear defendants' claims and the Alliance defendants' advertising activities is evident in this case.

The Sear defendants' beliefs (asserted in their interrogatory answers) about the motives for the alleged defamation cannot transform statements made in the course of providing professional consulting services into anything recognizable as "advertising." As Erie points out, most professionals hope that their work product will enhance their own professional reputations, but that fact cannot transform all professional work product or all statements made in furtherance of the business into "advertising" for purposes of such an insurance provision. The Alliance and Sear defendants would extend the phrase "in the course of advertising your goods, products or services" to any statements by the business that might directly or indirectly increase demand for its services. That approach would erase reasonable limitations on the term "advertising." Although many courts have considered the scope of similar "advertising injury" provisions, both in exclusions and in coverage provisions, none has stretched the phrase "in the course of advertising" that far. See *Playboy Enterprises v. St. Paul Fire & Marine Ins. Co.*, 769 F.2d 425, 429 (7th Cir.1985) (exclusion for statements "in the course of" advertising did not apply to eleven letters sent to magazine's

advertisers; exclusion for statements "related to" advertising was ambiguous so that insured was held entitled to coverage); *International Ins. Co. v. Florists' Mut. Ins. Co.*, 201 Ill.App.3d 428, 147 Ill.Dec. 7, 10, 559 N.E.2d 7, 10 (1990) (coverage for certain claims that "arise out of your advertising activities" did not apply to unfair competition claim based on organization's internal rule that was not reproduced or broadcast to the public); *John Deere Ins. Co. v. Shamrock Industries, Inc.*, 696 F.Supp. 434, 439–40 (D.Minn.1988) (coverage for wrongs "committed in the course of advertising your goods, products or services" applied to letters to customer promoting sale of insured's new product), *aff'd on other grounds*, 929 F.2d 413 (8th Cir.1991); *First Bank & Trust Co. v. New Hampshire Ins. Group*, 124 N.H. 417, 469 A.2d 1367 (1983) (coverage for "advertising injury ... arising out of the conduct of the named insured's business" did not extend to claim for insured's alleged failure to properly provide an advertised banking service); *Fox Chemical Co. v. Great American Ins. Co.*, 264 N.W.2d 385, 386 (Minn.1978) (exclusion for statements "in the course of or related to advertising, broadcasting or telecasting activities" did not exclude coverage for pamphlet that was provided to insured's own distributors but not to customers).

The broad coverage that the Alliance defendants seek would extend advertising coverage to most claims related to the insured's business. But an insured can reasonably expect to obtain such broad coverage only by buying other forms of insurance, such as errors and omissions liability coverage, which would cover the claims made here. See *Bank of the West v. Superior Court of Contra Costa County*, 2 Cal.4th 1254, 10 Cal. Rptr.2d 538, 553, 833 P.2d 545, 560 (1992). Accordingly, the advertising injury coverage under the Erie policy does not apply to the Sear defendants' suit against the Alliance defendants.

### Conclusion

A so-called "general" liability insurance policy is not a substitute for a professional "errors and omissions" or malpractice policy. The Alliance defendants could not reasonably have expected the Erie policy to provide insurance for the types of claims asserted by the Sear defendants. The professional services exclusion to coverage for personal injury liability applies to exclude those claims from Erie's duty to defend and its duty to indemnify. The policy's coverage for "advertising injury" does not apply to the claims asserted here because the Alliance defendants' statements were not made "in the course of advertising [Alliance's] goods, products or services." Erie is therefore entitled to a declaratory judgment in its favor. That judgment will be entered separately.