**NATIONAL BEN FRANKLIN INSURANCE COMPANY OF ILLINOIS, Plaintiff,**

v.

**CALUMET TESTING SERVICES, INC., Defendant.**

**No. 2–96–CV–492–TS.**

United States District Court,
N.D. Indiana,
Hammond Division.

Oct. 8, 1998.

## MEMORANDUM AND ORDER

SPRINGMANN, United States Magistrate Judge.

This case is before the Court on the Motion for Summary Judgment filed by Plaintiff, National Ben Franklin Insurance of Illinois ("Ben Franklin") on October 1, 1997. Defendant, Calumet Testing Services, Inc. ("Calumet"), filed its Memoran-

dum in Opposition to Plaintiff's Motion for Summary Judgment on January 9, 1998. Ben Franklin filed its Reply Memorandum in Support of Motion for Summary Judgment on January 29, 1998.

The case is a Declaratory Judgment action, brought pursuant to 28 U.S.C. § 2201, which presents issues of Indiana law concerning the extent of insurance coverage provided under policies issued by Ben Franklin to Calumet. The issue presented by this declaratory judgment action is whether two provisions contained in insurance policies between Ben Franklin and Calumet exclude coverage in connection with the claims being asserted against Calumet which are discussed below. Jurisdiction is based on diversity, and the parties agree that Indiana substantive law applies.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the federal rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 328, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1); *Hedberg v. Indiana Bell Tel. Co., Inc.*, 47 F.3d 928, 931 (7th Cir.1995).

A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *Methodist Medical Center v. American Medical Sec., Inc.*, 38 F.3d 316, 319 (7th Cir.1994); *Karazanos v. Navistar Int'l Transp. Corp.*, 948 F.2d 332, 338 (7th Cir.1991). In considering a summary judgment motion, a court must draw the reasonable inferences in the light most favorable to the opposing party and must resolve any doubt against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the burden rests on the party moving for summary judgment to show "that there is an absence of evidence to support the non-moving party's case," *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. 2548, the non-moving party may not simply rest on the pleadings, but must affirmatively demonstrate by specific factual allegations that a genuine issue of material fact exists for trial. *Billups v. Methodist Hosp. of Chicago*, 922 F.2d 1300, 1302 (7th Cir. 1991). "Neither 'the mere existence of some alleged factual dispute between the parties' nor the demonstration of 'some metaphysical doubt as to the material facts,' will sufficiently demonstrate a genuine issue of material fact. In that regard the 'mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient.'" *Forman v. Richmond Police Dept.*, 104 F.3d 950, 957 (7th Cir.1997) (quoting *Anderson*, 477 U.S. at 247, 252, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Interpretation of written contracts, such as insurance policies, is typically a matter of law and particularly appropriate for resolution by summary judgment. *Hurst–Rosche Engineers, Inc. v. Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir.1995). A court may determine whether the meaning or a term or a word in a contract is ambiguous as a matter of law. *Loudermilk v. Casey*, 441 N.E.2d 1379, 1383 (1982). However, if a court determines that a word or phrase in a contract is ambiguous, the meaning of the word or phrase becomes an issue of fact, and, therefore, inappropriate for resolution in a motion for summary judgment. *Id.*

## II. STATEMENT OF FACTS

Calumet Testing is in the business of providing destructive and non-destructive testing to its customers. The actual testing is done by Calumet technicians who fall into one of three categories. "Trainee" is the designation given new employees. They are given both classroom instruction and on-the-job training until they are able to pass a test to become a "level one" technician.

"Level one" technicians are permitted to do the actual testing procedures. However, they must be supervised by a "level two" technician. Furthermore, "level one" technicians are not permitted to interpret the tests. "Level one" technicians receive additional classroom instruction and on-the-job training before they are permitted to take a test to become a "level two" technician. Only technicians at level two or above can interpret the tests which Calumet performs for its customers. "Level two" technicians are required to take recertification tests every three years.

Beginning on September 1, 1989 and continuing through September 1, 1996, Ben Franklin issued a series of Commercial General Liability insurance policies to Calumet. The policies actually consisted of two pertinent coverage parts, a Commercial General Liability coverage part and a Commercial Catastrophe Liability coverage part. The policies contain two exclusions, one pertaining to each of the two coverage parts. The exclusion pertaining to the Commercial General Liability coverage part provides as follows:

### EXCLUSION–INSPECTION, APPRAISAL AND SURVEY COMPANIES

This endorsement modifies insurance provided under the following:

### COMMERCIAL GENERAL LIABILITY COVERAGE PART

This insurance does not apply to "bodily injury" "property damage" "personal injury" or "advertising injury" for which the insured may be held liable because of the rendering or failure to render professional services in the performance of any claim, investigation, adjustment, engineering, inspection, appraisal, survey or audit services.

The exclusion pertaining to the Commercial Catastrophe Liability coverage part provides as follows:

### GENERAL PROFESSIONAL EXCLUSION

This endorsement modifies insurance provided under the following:

### COMMERCIAL CATASTROPHE LIABILITY COVERAGE PART

Schedule: Description of Operations:

### ENGINEERS OR ARCHITECTS–CONSULTING INSPECTION AND APPRAISAL COMPANIES

This insurance does not apply to any act, error, omission or mistake committed, or alleged to have been committed, by or on behalf of the insured in rendering or failing to render service or advice of a professional nature in connection with any operation described in the Schedule.

On February 22, 1996, Steve Owen, a "level two" Calumet technician, used a Panametrics thickness meter to measure the thickness of the walls of a pressure tank located at the Beta Steel plant in Portage, Indiana. The measurements were done in the area around a pinhole leak which had apparently developed in the tank. Two days later, Steve Owen returned to Beta Steel to do additional thickness measurements on other tanks at Beta Steel. While he was there, he was asked to do magnetic particle testing on a weld. The weld was on the subject tank and was part of the repairs which had been performed on the pinhole leak sometime between February 22 and February 24. The "Report of Nondestructive Examination" provided to Beta Steel noted that: "No indications were noted and the weld was accepted."

On March 27, 1996, the tank on which Steve Owen had performed magnetic particle testing exploded, resulting in three deaths, a number of injuries, and extensive property damage. Lawsuits have been filed against Calumet and others, alleging

causes of action for wrongful death and personal injuries as a result of the explosion. With respect to Calumet, the complaints allege that Calumet held itself out to be an expert in the inspection and testing of such tanks, and that it was negligent in the inspection and testing of the tank.

## III. ANALYSIS

### A. General Principles of Contract Law in Indiana

■ This declaratory judgment action hinges on the meaning of the term "professional services" in the context of the insurance policies issued by Ben Franklin to Calumet from September 1, 1989 through September 1, 1996. This Court must follow principles of contract construction as defined by Indiana law. In Indiana:

Contracts of insurance are subject to the same rules of construction as are other contracts; construction of a written contract is a question of law for which summary judgment is particularly appropriate.

*Ramirez v. American Family Mut. Ins. Co.,* 652 N.E.2d 511, 514 (Ind.Ct.App. 1995). If the contract is ambiguous, it is construed against the insurance company.

■ A court's determination of the ambiguity of an insurance contract requires consideration of numerous factors:

"[T]here is no rule of construction that every term in an insurance contract must be defined, and the mere fact that a term is not defined does not render it ambiguous. Whether a contract is ambiguous is a question of law; and where the court determines there is no ambiguity, the terms of the contract are conclusive and the construction of those terms is also a matter of law to be determined by the court. An insurance contract is ambiguous when it is susceptible to more than one interpretation and reasonably intelligent persons would honestly differ as to its meaning. An ambiguity does not exist simply because a controversy exists between the parties, with each favoring a different interpretation.

An unambiguous policy must be enforced according to its terms, even those which limit the insurer's liability. Courts may not extend coverage delineated by the policy nor may it rewrite the clear and unambiguous language of the policy."

*Sans v. Monticello Ins. Co.,* 676 N.E.2d 1099, 1101–02 (Ind.Ct.App.1997). Therefore, this Court is not required to find the insurance contracts to be ambiguous solely based on the current disputes between the parties of this case, and should only find the provisions of the insurance contract to be ambiguous if "reasonably intelligent persons would honestly differ as to [their] meaning."

### B. Applicability of the Professional Services Exclusion

Calumet argues in its Opposition brief that the exclusions for professional services do not apply to the services provided by Calumet to Beta Steel, as the exclusions are only set forth in the insurance contracts under certain categories which are not inclusive of Calumet. Calumet contends that neither of the two exclusions which Ben Franklin is claiming—one, an Exclusion for Inspection, Appraisal, and Survey Companies and the other, a General Professional Exclusion—apply to the services provided to Beta Steel by Calumet. Calumet argues that, at the very least, the language and construction of these exclusions are ambiguous, thereby presenting an issue of fact inappropriate for resolution on summary judgment.

In its Opposition brief, Calumet first examines the exclusion from the Commercial General Liability coverage part, titled "Exclusion–Inspection, Appraisal and Survey Companies," which reads as follows:

**EXCLUSION–INSPECTION, APPRAISAL AND SURVEY COMPANIES**

This endorsement modifies insurance provided under the following:

**COMMERCIAL GENERAL LIABILITY COVERAGE PART**

This insurance does not apply to "bodily injury", "property damage" "personal injury" or "advertising injury" for which the insured may be held liable because of the rendering or failure to render professional services in the performance of any claim, investigation, adjustment, engineering, inspection, appraisal, survey or audit services.

Calumet's quarrel with applying this exclusion to the services it provided to Beta Steel is that the title limits the professional services exclusion to "Inspection, Appraisal and Survey Companies" and Calumet claims that it is not any of those types of companies. Calumet asserts that Ben Franklin has made no claim that Calumet is an appraisal or survey company, and Ben Franklin's belief that Calumet is an inspection company is incorrect. Calumet asserts that under a dictionary definition of inspection or under the ASME Pressure Vessel Code, the term Inspector would not apply to it, and that Calumet is actually a "testing" company rather than an inspection company.

The second exclusion claimed by Ben Franklin, from the Commercial Catastrophe Liability coverage part, is titled "General Professional Exclusion," and provides as follows:

### GENERAL PROFESSIONAL EXCLUSION

This endorsement modifies insurance provided under the following:

**COMMERCIAL CATASTROPHE LIABILITY COVERAGE PART**

Schedule: Description of Operations:
ENGINEERS OR ARCHITECTS–CONSULTING INSPECTION AND APPRAISAL COMPANIES

This insurance does not apply to any act, error, omission or mistake committed, or alleged to have been committed, by or on behalf of the insured in rendering or failing to render service or advice of a professional nature in connection with any operation described in the Schedule.

Calumet makes similar arguments with regard to Ben Franklin's use of this exclusion. Ben Franklin has admitted that Cal-

umet is not an engineering or architectural firm, the two initial categories in the description of operations. The other three categories "Consulting, Inspection, and Appraisal Companies" are separated from the first two categories by a dash. Calumet contends that the use of the dash is significant because it indicates that the phrase "consulting, inspection, and appraisal companies" is meant to modify the first two terms—Engineers or Architects. Calumet would interpret that heading as reading "Engineers and Architects" who are "consulting inspection and appraisal companies." As Ben Franklin admits that Calumet is not an architectural or engineering company, under that interpretation the exclusion would not apply to Calumet.

Calumet asserts in the alternative as to the second exclusion that even if the heading were interpreted to be a list of five separate types of companies, that Calumet would not fall under any of those categories. Relying on its contentions as to the first exclusion—that Calumet is not an engineering, architectural, consulting, or appraisal company, nor does it believe itself to be an inspection company—Calumet maintains that this exclusion would not apply to it in any event. At a minimum, Calumet argues, these terms are ambiguous and their meaning is an issue for the trier of fact.

■ The Court does not find the meaning of the headings for these "professional services" exclusions to be ambiguous, and disagrees with Calumet's interpretation of the term "inspection company" in both exclusions and the significance of the use of the dash in the second exclusion. As Ben Franklin points out in its Reply brief, while the services performed at Beta Steel by Calumet were certainly not official inspections as described by the ASME Pressure Vessel Code, the insurance contract does not require the inspections to be official to fall under the exclusion. Calumet also contends that the services it provided to Beta Steel could not even be considered

inspections, but that, rather, it was performing "tests." While that it certainly true, the Court does not find the terms "test" and "inspection" to be mutually exclusive.

Moreover, while Calumet carefully tries to only use the word "testing" in conjunction with the services that it provides, it does not always do so even within the documents filed with this Court. For example, while Calumet states in its Opposition brief that its purpose "was and is the performance of non-destructive testing," in its Exhibit A to its Opposition Brief its report made to Beta Steel on February 24, 1996 is entitled "Report of Nondestructive *Examination.*" (Mem.Opp. Pl.'s Mot. Summ.J. at 1 & Ex. A.) Another instance where a different term was used to describe the services provided by Calumet was in Steve Owen's own deposition where he described the "visual inspection" he performed as a part of his examination of the welds. (Owen Dep. at 25–26.) Overall, the Court finds the process of trying to parse out different meanings from the words "Test," "Inspection," and "Examination" to be tedious and unnecessary. All have similar meanings, and both the words "test" and "examination" contain the word "inspection" in their definitions. *Webster's II, New Riverside University Dictionary.* The Court does not believe that "reasonably intelligent people would honestly differ" as to the applicability of these exclusionary provisions to a company such as Calumet, regardless of whether it believes itself to be in the business of testing, examinations, or inspections. The Court finds that Calumet was in the business of conducting inspections as the word is commonly used.

■ Calumet also argues that the dash used in the heading of the second exclusion for Commercial Catastrophe Liability indicates that the phrase "consulting, inspection, and appraisal. companies" is meant to modify the first two terms—Engineers or Architects, and that the phrase, therefore, should read "Engineers and Architects" who are "consulting inspection and ap-

praisal companies." However, as Ben Franklin points out in its Reply brief, a dash can be used to simply set off several different categories from one another, and does not necessarily indicate that the latter words modify the former. Ben Franklin points to other instances in the insurance contracts where the dash is used as a separator of different categories, and the Court finds this interpretation to be more harmonious with the rest of the contract. Additionally, interpreting the dash as Calumet describes would make this exclusion inconsistent with the other exclusion under the General Liability Coverage Part for professional services which includes professional services relating to investigation, adjustment, engineering, inspection, appraisal, survey or audit services. It is unlikely that the parties intended to create one professional services exclusion which applies to seven different kinds of professional services, and another which only applies to engineers and architects.

This Court finds that neither of the headings of the two exclusions is meant to prevent their application to a business such as Calumet's, and that the professional services exclusion contained in the insurance policy is, therefore, applicable to Calumet as a business. The next issue for the Court is to determine if the types of services performed by Calumet were "professional services" as defined under the contracts.

## C. Professional Services Exclusion

Although the language of the two exclusions is slightly different, both exclude coverage for claims arising out of the policy holder's providing or failing to provide "professional services." Resolution of this case ultimately depends on whether the claims against Calumet arise out of its providing or failing to provide professional services. If the services provided by Steve Owen, Calumet technician, to the Beta Steel plant on February 22 and February 24, 1996, constituted "professional services" under the insurance contract be-

tween Calumet and Ben Franklin, then coverage is excluded, and judgment should be granted in favor of Ben Franklin. The exclusions themselves fail to define the intended meaning of "professional services" by the parties, and the Court must, therefore, look to Indiana's interpretation of the phrase for guidance.

Unfortunately, there are few Indiana state cases which interpret or discuss the meaning of the phrase "professional services" as it is used in an exclusion to coverage in an insurance policy. With the exception of two fairly recent cases, *Terre Haute First Nat'l Bank v. Pacific Employers Ins. Co.*, 634 N.E.2d 1336 (Ind.Ct. App.1993) and *Erie Ins. Group v. Alliance Environmental, Inc.*, 921 F.Supp. 537, 546 (S.D.Ind.1996), this Court has not found any recent, applicable cases which analyze the term "professional services" under principles of Indiana law. Therefore, with the exception of those two cases, as well as several older cases from the Indiana Court of Appeals, this Court's analysis relies heavily on the interpretations of other courts of the term "professional services" in the context of insurance contracts.

The most often-quoted definition of "professional service" is found in the case of *Marx v. Hartford Acc. & Indem. Co.*, 183 Neb. 12, 157 N.W.2d 870 (1968):

A 'professional' act or service is one arising out of a vocation, calling, occupation, or employment involving specialized knowledge, labor, or skill, and the labor or skill involved is predominantly mental or intellectual, rather than physical or manual.

In that case, an employee at a medical office mistakenly filled a sterilizer with Benzene instead of water, resulting in an explosion and property damage. No patient was being treated at the time. The court concluded that this did not constitute a "professional service" because it required no special training or professional skill. A similar definition of "professional services" was adopted by the Indiana Court of Appeals in 1993 in *Terre Haute First Nat'l Bank v. Pacific Employers Ins.*

*Co.*, 634 N.E.2d 1336, 1339 n. 2 (Ind.Ct. App.1993) (citing *State Street Bank & Trust Co. v. INA Ins. Co.*, 207 Ill.App.3d 961, 153 Ill.Dec. 327, 567 N.E.2d 42, 47 (1991)).

*Centennial Ins. v. Neyer, Tiseo & Hindo*, 207 Mich.App. 235, 523 N.W.2d 808 (1994), involved damage to an underground utility. The court found that the decision to drill before calling the utility locator service was "preliminary to and a part of the 'professional service' of conducting soil investigation." In *Multnomah County v. Oregon Auto. Ins. Co.*, 256 Or. 24, 470 P.2d 147 (1970), the policy excluded liability "due to the rendering of or failure to render any professional service." *Id.* at 149. In that case, a jail inmate had sued the county, alleging that a medical technician at the county jail had not given him insulin. The court found that coverage was excluded. The court observed that, if only the ability to physically administer the insulin had been involved, there would have been coverage. *Id.* at 150. However, since the "decision to give or withhold the insulin required the application of special learning," there was no coverage. *Id.*

There is a well-recognized distinction between "errors and omissions" or "professional malpractice" policies and general business liability policies. Calumet was well aware of this distinction. The subject of the need for professional liability insurance came up repeatedly during the period of time when Ben Franklin insured Calumet. On numerous occasions Calumet, because of provisions of contracts it entered into with its customers, completed applications for professional services coverage with various insurance companies. On each occasion, apparently because of cost, it declined to purchase that insurance.

The distinction is well recognized by the courts. In *Harad v. Aetna Cas. & Surety Co.*, 839 F.2d 979 (3d Cir.1988), the policy provided that, when issued to an attorney, it excluded liability "arising out of the rendering or failure to render any professional service." *Id.* at 981. The attorney

insured was accused of malicious prosecution. The trial court concluded that there was coverage because the attorney had not rendered, or failed to render, professional services to the party that actually sued him. *Id.* The Third Circuit Court of Appeals reversed because "[the] liability in this case flowed directly from his performance of a professional activity." *Id.* at 985. The court rejected the argument that there was coverage because it was a "business owners policy" and the practice of law was the insured's "business." *Id.* The case contains a good discussion of the distinction between business activities and professional activities:

> For example, if an attorney, while hosting a real estate closing in his offices, places his briefcase on the floor and a colleague trips on it, is injured and sues him, the lawyer's liability would derive not from the rendering of professional services, but rather from his operation of a business.

*Id.*

For the exclusion to apply, the activity need not be one for which traditional professional training, e.g. doctor, lawyer or engineer, is required. In *Hollingsworth v. Commercial Union Ins. Co.,* 208 Cal. App.3d 800, 256 Cal.Rptr. 357 (1989), the activity involved was ear piercing. The court held that there was no coverage, observing that: "The dictionary definition of 'professional' encompasses a broad range of activities beyond those traditionally considered 'professions' such as medicine, law or engineering." *Id.* at 360. The court observed that:

> The injury ... did not arise from any deficiency in the premises, such as a slippery floor or unsafe fixture, but from a separate and distinct service offered to benefit [the owner's] interest in the enterprise....

*Id.* at 362. As the court was careful to point out, the fact that a license was not required to perform ear piercing and the fact that the activity did not require extensive training or technical skill made no difference in the outcome. *Id.* at 357.

The distinction also applies when the policy holder has a professional liability policy and is seeking coverage for what is a general business risk. In *Albert J. Schiff Assoc., Inc. v. Flack,* 51 N.Y.2d 692, 435 N.Y.S.2d 972, 417 N.E.2d 84 (1980), the policy holder was accused of misappropriating a trade secret. In finding no coverage under a professional liability policy, the court observed:

> The renting of an office, the engagement of employees, arrangements to expand the size of one's activities, these may all have some connection with a covered business or profession. But, while they may set the stage for the performance of business or professional activities, they are not the professional activities contemplated by this special coverage. An errors and omissions policy is intended to insure a member of the designated calling against liability arising out of the mistakes inherent in the practice of that particular profession or business [citation omitted]. After all, the plaintiff's policy here was neither a standard general liability policy nor a standard general liability policy with a contractual liability indorsement. Nor was it one comprehensive enough to protect against all business vicissitudes. To hold otherwise, on a fair reading of the policies, would be to create additional coverage beyond that which was bought and paid for.

*Schiff,* 435 N.Y.S.2d 972, 417 N.E.2d at 88.

The Southern District of Indiana, in *Erie Ins. Group v. Alliance Environmental, Inc.,* found that while "not every action a professional takes in the course of providing professional services will be a professional service for insurance purposes, ... when the professional draws upon (or at least *should* draw upon) his or her professional knowledge, experience, and training in taking some action, that is a professional service for insurance purposes." *Erie,* 921 F.Supp. at 546. Thus, when "the insured is being sued for taking actions in the course of providing profes-

**846**

sional services, and where those actions both are reasonably related to the services being provided and involve the use of (or failure to use) professional knowledge, skill, experience, or training, the 'professional services' exclusion applies." *Id.* at 547.

 The services performed by Steve Owen, and thus by Calumet, on February 24, 1996, clearly fall within the definition of "professional services." While the actual testing itself may be close to "physical or manual," the interpretation of that testing beyond question involves professional knowledge, experience, and training. In order to interpret the test, Steve Owen had to have extensive classroom instruction and 160 hours of on-the-job training. His helper, a level one technician, could perform the tests, but could not interpret them. It is the interpretation of the test that caused Calumet to be sued. That is a professional service which is excluded under the clear, unambiguous terms of the policy.

### IV. CONCLUSION

The policy purchased by Calumet is a general business liability policy. The policy clearly excludes coverage for claims arising out of rendering or failing to render professional services. The services provided by Calumet to Beta Steel were professional services. The claims against Calumet arise out of those services. National Ben Franklin Insurance Company of Illinois is entitled to a declaratory judgment in its favor that it has no duty to defend or indemnify Calumet Testing Services, Inc. with respect to claims which have been, or in the future may be, asserted against it arising out of the explosion which occurred at Beta Steel on March 27, 1996.

Therefore, for the reasons articulated in this memorandum order, the Court GRANTS the motion for summary judgment of the Plaintiff, National Ben Franklin Insurance Company of Illinois and finds that it has no duty to defend or indemnify Calumet Testing Services, Inc. with re-

spect to claims which have been, or in the future may be, asserted against it arising out of the explosion which occurred at Beta Steel on March 27, 1996.