NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 53

No. 2018-262

| | |
|---|---|
| Integrated Technologies, Inc. | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Civil Division |
| | |
| Crum & Forster Specialty Insurance Company | February Term, 2019 |

Robert A. Mello, J.

Bruce Palmer of Downs Rachlin Martin PLLC, St. Johnsbury, for Plaintiff-Appellant.

Doreen F. Connor of Primmer Piper Eggleston & Cramer PC, Manchester, New Hampshire, and Gary S. Kull of Kennedys CMK, Basking Ridge, New Jersey, for Defendant-Appellee.

PRESENT: Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.

¶ 1. **EATON, J.** Integrated Technologies, Inc. (ITI) appeals from the trial court's summary judgment decision in favor of Crum & Forster Specialty Insurance Company (Crum). ITI alleged that Crum breached its duty to defend ITI against a suit brought by the GOAD Company. The court granted summary judgment to Crum, finding no claim in the GOAD complaint that was potentially covered by the policy's Errors & Omissions (E&O) Liability Coverage Part. ITI asserts that the court misread the allegations in the GOAD complaint and interpreted the policy coverage too narrowly. We affirm.

I.  Crum Policy

¶ 2.     ITI is an engineering and project-management firm that works predominantly in the metals plating and finishing industry.  Crum insured ITI under two policies between March 16, 2014 and March 16, 2016, identical in all relevant respects and collectively referred to as the policy.  The policy provided E&O liability coverage as well as commercial general liability and contractors' pollution liability coverage.

¶ 3.     Generally speaking, an E&O policy is " 'a specialized and limited type of coverage . . . designed to insure members of a particular professional group from the liability arising out of a special risk such as negligence, omissions, mistakes and errors inherent in the practice of the profession.' " Crum & Forster Managers Corp. v. Resolution Tr. Corp., 620 N.E.2d 1073, 1078 (Ill. 1993) (quoting 7A J. Appleman & J. Appleman, Insurance Law & Practice § 4504.01, at 310 (rev. 1979) (emphasis omitted)).  It is " 'the equivalent to malpractice insurance for occupations other than those in the legal and medical fields.' " Id. (quoting 11 Couch on Ins. 2d § 44:396, at 573-74 (rev. ed. 1982)).  As Couch explains,

> The provision of "professional services," as defined in professional liability policies, necessarily entails an application of special learning unique to the insured's profession. . . .
>
> No matter the occupation of the insured, the terms of the policies are quite similar, requiring that an act or omission arise out of the provision of "professional services" in the context of the particular occupation of the insured.  Accordingly, while certain general principles can be gleaned which apply to all such policies, the determination of what constitutes a "professional service" is unique to each insured profession.

9A S. Plitt, et al., Couch on Ins. § 131:42 (3d ed. 2018).

¶ 4.     By its terms, the E&O policy here covered "damages" that the insured becomes legally obligated to pay "because of" a "wrongful act" to which the insurance applies.  Under the policy:

> "Wrongful act" means an act, error or omission in the rendering or failure to render "professional services" by any insured . . . .
>
> "Professional services" means those functions performed for others by you . . . that are related to your practice as a consultant, engineer, architect, surveyor, laboratory or construction manager.

The E&O Part is limited by the policy's "Common Exclusions," including exclusions for damages based upon or arising out of "[a]ny criminal, fraudulent, or dishonest act, omission or offense committed by the insured" and "[a]ny act, omission or offense committed by the insured with knowledge of its wrongful nature or with the intent to cause damage." See generally 7 Couch on Ins. § 101:22 ("In general, it is against public policy for an insurance contract to provide coverage for the intentional or willful misconduct of an insured.").

## II. GOAD Complaint

¶ 5.      GOAD is a vendor of materials and services to customers with metal plating facilities. In November 2015, GOAD sued ITI in Missouri state court on four counts: breach of contract-teaming agreement; breach of contract-commission agreement; tortious interference with business expectancy; and injurious falsehood.

¶ 6.      GOAD alleged the following facts. In 2012, the U.S. Army requested proposals for an Energy Improvement Project (the "Project"). Honeywell Building Solutions sought to be selected as the Project's Energy Service Company (ESCO). If selected, Honeywell would submit a final proposal, with pricing, which the Army would accept if fair and reasonable.

¶ 7.      The Project included a substantial process-plating component and Honeywell asked GOAD to work with it to support its bid. GOAD agreed to do so with the understanding that it would be Honeywell's sole-source subcontractor as long as GOAD's pricing was fair and reasonable. GOAD developed proposed schedules, budgets, and forecasts for the Project, in addition to securing subcontractors as needed. In late 2012, the Army selected Honeywell as the ESCO and awarded it the "Right to Bid" for the Project.

3

¶ 8. To support Honeywell's final proposal, GOAD was tasked with developing detailed scopes of work, with pricing, for all phases of the process plating improvements. To assist in this endeavor and in the subsequent work on the Project, GOAD "found ITI . . . to provide certain engineering and certain project management services for the plating process improvements, as a subcontractor to GOAD."

¶ 9. GOAD and ITI originally agreed that ITI would be GOAD's subcontractor and give GOAD a 10% discount on amounts GOAD would bill to Honeywell for ITI's work. The parties later agreed that Honeywell would issue purchase orders directly to ITI. As a result, in April 2013, ITI and GOAD entered into a commission agreement whereby ITI would bill Honeywell directly for ITI's work while paying a commission to GOAD. The same month, ITI and GOAD also entered into a "teaming agreement" pursuant to which ITI promised not to solicit or compete directly or indirectly with GOAD for Honeywell Energy Performance Contracts and related projects.

¶ 10. GOAD alleged that notwithstanding the Teaming Agreement, ITI "repeatedly undermined" GOAD, "falsely represent[ing]" to Honeywell that GOAD's work "was not industry standard" and "did not reflect best practices." At least initially, ITI suggested to Honeywell that Honeywell could save significant money by removing GOAD as the sole-source subcontractor for plating process improvements. ITI indicated that Honeywell could then break up the work promised to GOAD into discrete modules and seek competitive bids on those modules. To that end, in October 2013, ITI proposed to Honeywell that ITI perform engineering and project management work directly for Honeywell, not as a subcontractor of GOAD. ITI's proposal also included additional scope for ITI in terms of project management.

¶ 11. Accepting ITI's representations, Honeywell decided in October 2013 not to use GOAD as its sole-source subcontractor for plating process improvements. In December 2013, Honeywell was awarded the Army contract. In January 2014, Honeywell told GOAD for the first

4

time that it intended to solicit competitive bids for the entire scope of GOAD's work on the Project. In May 2014, ITI reversed course and, instead of supplying Honeywell with competitive bids for the plating process improvements, ITI proposed that it serve as subcontractor for the work previously to be performed by GOAD. Honeywell agreed, despite its misgivings. In September 2014, Honeywell issued a purchase order to ITI for more than $16.5 million for metal plating and finishing systems modernization. The work contemplated by the purchase order encompassed all the work that GOAD was to have performed for Honeywell before ITI convinced Honeywell to remove GOAD from the project.

¶ 12. While work on the Project remained ongoing, Honeywell had determined that it would not achieve the cost savings that ITI promised. Additionally, Honeywell had determined that ITI could not complete the plating process improvements within the timeframe provided to the Army in Honeywell's final proposal. GOAD alleged, on information and belief, that ITI never actually believed that Honeywell could reduce its costs on the Project by $2.5-$3.5 million by competitively bidding GOAD's work and instead made that suggestion solely to position itself as the successor to GOAD's role. ITI did not pay GOAD the commissions due under their agreement. GOAD sought actual damages, punitive damages, and costs.

### III. Denial of Coverage and ITI-Crum Suit

¶ 13. ITI informed Crum of the GOAD suit and in November 2015, Crum denied coverage. ITI settled the case with GOAD in December 2015. ITI then sued Crum alleging that it breached its duty to defend ITI under the E&O Part. ITI argued that given Crum's "unjustified refusal to defend or settle" the GOAD case, Crum was now bound by the amount of ITI's settlement with GOAD.

¶ 14. The parties filed cross-motions for summary judgment. ITI asserted that the definition of "professional services," i.e., "those functions performed for others by you . . . that are related to your practice as a consultant, engineer, . . . or construction manager," encompassed any

5

act having a "nexus" to ITI's professional activity. It construed GOAD's complaint as alleging that ITI used its professional skill and judgment to tell Honeywell how Honeywell could lower its costs on the project, thereby damaging GOAD's chances. ITI conceded that Count II of the GOAD complaint—the alleged breach of the Commission Agreement—had no "nexus" to "professional services."

¶ 15.   Crum argued that GOAD's claims were not covered. It explained that the complaint included two breach-of-contract claims and two counts alleging intentional torts. All counts, Crum asserted, rested on allegations that ITI used misrepresentations and falsehoods to steal GOAD's client. Crum maintained that it had no duty to defend or indemnify ITI because these claims did not involve ITI's provision of "professional services." Crum also noted the policy's exclusions, and argued that, even assuming that ITI's actions fell within the definition of "professional services," coverage would be barred by the exclusion for "criminal, fraudulent, or dishonest acts."

¶ 16.   After comparing the policy language and the allegations in the GOAD complaint, the trial court granted summary judgment to Crum. In reaching its conclusion, the court discussed the general purpose of E&O policies. See, e.g., Crum & Forster Managers Corp., 620 N.E.2d at 1078. It also reviewed case law, finding that courts regularly rejected insureds' attempts to shoehorn into an E&O policy any allegations "touching" their professions, requiring instead that the wrongful act or omission be "inherent" in the profession. See Utica Mut. Ins. Co v. Herbert H. Landy Ins. Agency, Inc., 820 F.3d 36, 42 (1st Cir. 2016); see also Massamont Ins. Agency, Inc. v. Utica Mut. Ins. Co., 489 F.3d 71, 73 (1st Cir. 2007); Crum & Forster Managers Corp., 620 N.E.2d at 1078 (stating that "[a]lthough there may be a myriad of risks to which one performing services in a . . . professional capacity may be exposed, covered risks are only those which inherently arise out of the rendering" of professional services, and finding intentional torts and

6

unfair business practices not within E&O policy); Shelton v. Am. Ins. Co., 507 So. 2d 894, 896-97 (Miss. 1987); Albert J. Schiff Assocs., Inc. v. Flack, 417 N.E.2d 84, 85-88 (N.Y. 1980).

¶ 17.   The court found that neither GOAD nor ITI alleged that ITI committed an error or omission.  Instead, ITI argued that it used its professional skill and judgment to give an ostensibly accurate, professional opinion that had the effect of denigrating GOAD and promoting itself.  The court found ITI's coverage arguments credible only so long as one overlooked that it sought coverage for intentional torts under its professional malpractice policy.

¶ 18.   The court found that ITI's broad construction of the terms "professional services" and "related to" took the policy language out of context, ignoring both the nature of the policy and the limiting principle that such policies insured against a profession's inherent risks.  Not every action requiring professional skill touched an inherent risk, the court observed, and while it might require professional skill to undermine and replace an intermediate contractor on a large-scale project, it was not inherent in a sub-subcontractor's profession to do so.  The court found the Crum policy straightforward and concluded that GOAD's allegations against ITI did not fall within it.  It thus granted summary judgment to Crum.  This appeal followed.

IV.  Arguments on Appeal

¶ 19.   On appeal, ITI complains that the trial court read the coverage grant narrowly and imported concepts like "inherent in the profession" from outside the policy language.  It suggests that the policy language is "very broad" in part because the definition of a "wrongful act" includes "acts" as well as "errors or omissions" and because "professional services" is defined as "functions performed for others by you . . . related to your practice as a consultant, engineer, . . . or construction manager."  (Emphasis added.)  Cf. 9A Couch on Ins. § 131:42 (recognizing that E&O policies generally cover "an act or omission").  As it did below, ITI maintains that the GOAD complaint contained "multiple allegations of liability arising out of 'acts, errors or omissions' that were part and parcel of the profession of industrial engineering and project management."

7

According to ITI, GOAD alleged that it was harmed by ITI's "process of selection of subcontractors and breaking up of the work into modules to better support a competitive bidding process" and because ITI "provided strategic input directly to Honeywell to support overall project management in ways that were ultimately detrimental to GOAD." If "inherent in the profession" is the correct standard, ITI contends that it is satisfied.

¶ 20. ITI also asserts that the trial court failed to meaningfully compare the GOAD complaint to the policy language. It argues that GOAD alleged more than just intentional conduct on ITI's part with respect to the two tort claims. It cites an allegation made with respect to the tortious-interference-with-business-expectancy claim that ITI "acted with reckless disregard for GOAD's rights."[1] ITI makes a similar claim with respect to the injurious-falsehood count, citing GOAD's allegations that "ITI knew that [certain] statements were false or acted with reckless disregard of their truth or falsity" and that "[i]n communicating these injurious falsehoods to Honeywell, ITI committed intentional wanton, willful, and outrageous acts without justification, or acted with reckless disregard for GOAD's rights." According to ITI, by focusing only on intentional conduct, the court "effectively decide[d] a contested issue in the underlying case on summary judgment."[2]

---

[1] The full sentence states: "In <u>intentionally interfering with</u> GOAD's valid business expectancy, ITI committed intentional wanton, willful, and outrageous acts without justification, or acted with reckless disregard for GOAD's rights." (Emphasis added.)

[2] ITI also argues that the court "effectively found" that the allegations in the GOAD complaint were barred by an exclusion for an "act, omission, or offense committed by the insured with knowledge of its wrongful nature or with the intent to cause damage." It asserts that this "defense was irrelevant to the duty to defend, since 'knowledge' of whether actions were 'wrongful' is an inherently subjective inquiry" as is the "intent to cause damage." ITI argues that the court should not have considered this question on summary judgment; it raises other arguments related to the application of the exclusion as well. It is not apparent that the trial court considered or relied upon this exclusion in reaching its decision. In any event, we do not address these arguments because we do not rely on this, or any other, exclusion. See <u>Ray v. Valley Forge Ins. Co.</u>, 77 Cal. App. 4th 1039, 1048 (Cal. Ct. App. 1999) ("[I]f the insuring clause does not cover a claimed loss, then there is no coverage. In such a circumstance, there is no need to consider policy

V. Analysis

¶ 21.   We review the court's summary judgment decision "de novo, applying the same standard as the trial court." Bradford Oil Co. v. Stonington Ins. Co., 2011 VT 108, ¶ 5, 190 Vt. 330, 54 A.3d 983.  Summary judgment is appropriate "if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Id.; see also V.R.C.P. 56(a). We conclude that summary judgment was properly granted to Crum here.

¶ 22.   We apply well-established legal principles to this dispute.  "Insurers have a duty to defend when the claim against the insured might be of the type covered by the policy." Coop. Ins. Cos. v. Woodward, 2012 VT 22, ¶ 10, 191 Vt. 348, 45 A.3d 89 (quotation omitted).  To determine if a duty to defend exists, "we compare the language of the policy to the language of the complaint." Id.  It "is the actual complaint, not some hypothetical version, that must be considered." Conn. Indem. Co. v. DER Travel Serv., Inc., 328 F.3d 347, 350-51 (7th Cir. 2003). "[L]abels are not controlling." Utica Mut. Ins. Co., 820 F.3d at 44.  Instead, the "duty to defend is determined by the factual allegations of the complaint." Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co., 265 S.E.2d 38, 40 (S.C. 1980).  "[W]here there is no possibility that the insurer might be obligated to indemnify, there is no duty to defend." City of Burlington v. Nat'l Union Fire Ins. Co., 163 Vt. 124, 127, 655 A.2d 719, 721 (1994).

¶ 23.   "The interpretation of an insurance policy, like other contracts, is a question of law over which our review is nondeferential and plenary." N. Sec. Ins. Co. v. Doherty, 2009 VT 27, ¶ 7, 186 Vt. 598, 987 A.2d 253 (mem.).  "We give effect to the plain meaning of the terms of the policy," and read "[d]isputed terms . . . according to their plain, ordinary and popular meaning." Coop. Ins. Cos., 2012 VT 22, ¶ 9 (quotation omitted).  "If we find ambiguity, we construe the

exclusions because exclusions serve to limit coverage granted by an insuring clause and thus apply only to hazards covered by the insuring clause." (quotation and emphasis omitted)).

9

language in favor of coverage, which promotes the 'protective purpose' of effectuating the parties' intent that the insured be, in fact, insured." Id. "Our guiding principle requires us to review the language of an insurance contract from the perspective of what a reasonably prudent person applying for insurance would have understood it to mean." Id. (quotation omitted).

¶ 24. "[I]n determining the reasonable expectations of the parties to an insurance contract, we must consider the policy in its entirety with an eye toward its general purpose." State Farm Mut. Auto. Ins. Co. v. Roberts, 166 Vt. 452, 461, 697 A.2d 667, 673 (1997); see also City of Burlington v. Glens Falls Ins. Co., 133 Vt. 423, 424, 340 A.2d 89, 90 (1975) (recognizing that "policy terms must . . . be given interpretation consistent with" purpose of policy). The purpose of an E&O policy—providing "the equivalent of malpractice insurance for occupations other than those in the legal and medical fields," Crum & Forster Managers Corp., 620 N.E.2d at 1078 (quotation omitted)—bears on "what a reasonably prudent person applying for insurance would have understood" the policy language to mean. Coop. Ins. Cos., 2012 VT 22, ¶ 9.

¶ 25. With this in mind, we examine anew the policy terms and the GOAD complaint. As previously noted, the E&O policy here covers damages "resulting from" and "because of" a "wrongful act." A "wrongful act" is "an act, error or omission in the rendering or failure to render professional services." "Professional services" are "those functions performed for others by you . . . that are related to your practice as a consultant, engineer, . . . or construction manager."

¶ 26. We reject ITI's suggestion that the words "related to" in the policy means simply "connected to" or "associated with." The cases ITI cites for this proposition are inapposite and none involve the interpretation of similar language in an E&O Policy. See, e.g., Dormitory Auth. of N.Y. v. Cont'l Cas. Com, 756 F.3d 166, 170 (2d Cir. 2014) (considering whether two particular issues were "related claims under the policy wording because they arise out of a single wrongful act or related wrongful acts" (quotation and alteration omitted)); State v. Philip Morris USA Inc., 2008 VT 11, ¶ 17, 183 Vt. 176, 945 A.2d 887 (stating that arbitration clause that applied to disputes

10

"arising out of or relating to" determinations by auditor encompassed "any" determination made by auditor (quotation omitted)). We instead agree with Couch that "[t]he provision of 'professional services' . . . necessarily entails an application of special learning unique to the insured's profession." 9A Couch on Ins. § 131:42; see also Shelton v. Am. Ins. Co., 507 So. 2d 894, 896 (Miss. 1987) (" 'A professional act or service within a malpractice policy is one rising out of vocation, calling, occupation, or employment involving specialized knowledge, labor or skill . . . .' " (quoting 7A J.A. Appleman, Ins. Law & Practice, § 4504.01, at 309-10 (Berdal ed. 1979)). Without this limiting principle, the "specialized and limited type of coverage" provided by an E&O policy would be expanded into a comprehensive liability policy. Crum & Forster Managers Corp., 620 N.E.2d at 1078 (quotation omitted).

¶ 27. We conclude that the GOAD complaint contains no claims that fall within the language of the policy. We do not address the alleged breach of the Commission Agreement because ITI conceded below that it does not fall within the scope of the E&O Part. We thus begin with GOAD's allegation that ITI breached the "Teaming Agreement." With respect to this claim, GOAD alleged that ITI promised "not to solicit or compete directly or indirectly with GOAD for Honeywell Energy Performance Contracts and related projects" and that it breached this agreement "by soliciting work directly from Honeywell on the . . . Project and/or competing with GOAD to serve as Honeywell's subcontractor for plating process improvements on the . . . Project."

¶ 28. This breach-of-contract claim does not arise from "an act, error or omission in the rendering or failure to render 'professional services' by any insured." ITI's alleged breach of its contract with GOAD did not arise in the course of ITI's provision of professional services to GOAD; rather, ITI was providing professional project-management services to Honeywell while acting as a business associate of GOAD. While ITI is alleged to have taken actions in rendering advice to Honeywell that breached its obligations to GOAD, such a breach of ITI's business promises to GOAD cannot reasonably be likened to professional malpractice against GOAD.

11

¶ 29. Other courts have similarly declined to apply E&O coverage for breaches of business agreements that did not entail the provision of professional services requiring "application of special learning unique to the insured's profession." 9A Couch on Ins. § 131:42. In Massamont Insurance Agency, Inc., for example, the court rejected the argument that Massamont, an insurance company, was entitled to coverage under an E&O policy for its alleged breach of an "exclusivity clause." 489 F.3d at 75. Massamont was alleged to have breached its promise to another insurance company (Westchester) to solicit a particular kind of insurance business only for Westchester. The E&O policy at issue covered "claims of . . . loss that arise out of a wrongful act allegedly committed in the conduct of the insured's business . . . in rendering or failing to render professional services as an insurance agent." Id. at 72 (quotations omitted). The insurer denied coverage and Massamont sued.

¶ 30. The Massamont court granted summary judgment to the insurer. It concluded that "[a] promise by an agent to represent one insurer exclusively for certain lines of insurance is not itself a professional service, nor does a diversion of business in breach of such a contract comprise the performance of professional service." Id. at 73. In interpreting the term "professional services," the court noted that other courts construing E&O policies often "treat as a touchstone whether or not the wrongful act draws on professional skills as opposed to ordinary business decision-making." Id. It explained that there must be "[s]omething more than an act flowing from mere employment or vocation." Id. at 74 (quotation omitted). "[O]vercharging clients in fees," for example, "even though for work done in a professional capacity, is not itself a professional service covered by malpractice or E&O policies." Id. at 73.

¶ 31. Massamont argued that coverage was warranted because a disagreement over its "alleged mismanagement of insurance for Westchester" led Massamont to divert business and that "diversion underl[aid] the alleged breach of the exclusivity provision." Id. at 74. The court rejected this argument, explaining that "while the policy does use 'arising out of' language

12

(construed generously in Massachusetts), a mere remote causal connection is not enough." Id. (citation omitted). It reasoned that while Massamont's "decision to divert business might have been caused by friction over insurance matters," its decision "was a distinct business decision . . . as to whether to maintain a relationship with a particular insurer—like leasing a building, buying supplies or charging for services." Id. This type of decision was "not the provision of professional services—the target of an E&O or malpractice policy." Id.

¶ 32. We reach a similar conclusion here. ITI's decision to break its promise to GOAD was not made in the course of providing "professional services." Although the breach occurred broadly in the context of ITI's provision of consulting and project-management services to Honeywell, this attenuated connection is not sufficient to convert a breach of ITI's business agreement with GOAD into "an act, error or omission in the rendering or failure to render 'professional services' by any insured." No reasonable person would have expected this type of alleged conduct to be covered by the E&O policy at issue.

¶ 33. The same considerations preclude coverage with respect to GOAD's tort claims, beginning with the tortious-interference-with-business-expectancy claim. GOAD asserted in its complaint that "ITI intentionally interfered with GOAD's valid business expectancy"; that it "lacked justification for intentionally interfering with GOAD's valid business expectancy"; and that, "[a]s a result of ITI's intentional interference, GOAD has suffered damages." GOAD further alleged that "ITI knew of GOAD's valid business expectancy"; it "intentionally interfered with GOAD's valid business expectancy by causing Honeywell to remove GOAD from its role"; and it accomplished this by "misrepresent[ing] facts and breach[ing] its obligations to GOAD." As with GOAD's claim for breach of contract, its claim for tortious interference arises from actions ITI took in the course of providing project-management services for Honeywell. The allegedly breached duty was not ITI's duty of care to the client to whom it was providing professional project-management services—Honeywell—but, rather, was its common law duty to GOAD as a

13

business competitor. "It is the <u>source</u> from which the plaintiff's . . . injury originates rather than the specific <u>theories of liability</u> alleged in the complaint which determines the insurer's duty to defend." <u>Bagley v. Monticello Ins. Co.</u>, 720 N.E.2d 813, 817 (Mass. 1999) (recognizing that "[t]his principle has been consistently applied in insurance law" and citing cases); <u>Utica Mut. Ins. Co.</u>, 820 F.3d at 44 (recognizing that "labels are not controlling"). Like GOAD's breach-of-contract claim, its tortious-interference claim does not arise from acts undertaken in the course of rendering professional services to GOAD, and cannot be likened to a malpractice claim.

¶ 34. The Illinois Supreme Court considered a similar question in <u>Crum & Forster Managers Corp.</u>, 620 N.E.2d at 1079, and we find its reasoning persuasive here. In <u>Crum</u>, a realty company, Dependable, sued another realty company, Mid-State, alleging that certain Dependable employees "formed Mid-State as a competitor of Dependable, induced others on Dependable's sales staff to leave Dependable and join Mid-State's sales staff," and committed other acts, such as stealing trade secrets, that were detrimental to Dependable. <u>Id</u>. at 1077. Mid-State sought coverage under a professional liability policy issued by Crum, which covered damages incurred "by reason of any act, error or omission in professional services rendered . . . by the Insured . . . and arising out of the conduct of the Insured's profession as a real estate agent or real estate broker." <u>Id</u>. at 1078 (emphasis omitted). Crum denied coverage and the court concluded that Crum had no duty to defend.

¶ 35. At the outset, the court considered the nature of the policy at issue. See <u>id</u>. ("In construing the scope of coverage afforded by the policies before us, we initially consider the type of policy for which the parties have contracted."). It emphasized that an E&O policy is "a specialized and limited type of coverage" and it "is not a substitute for liability coverage." <u>Id</u>. (quotations omitted). While "there may be a myriad of risks to which one performing services in a real estate professional capacity may be exposed," the court explained, "covered risks are only those which inherently arise out of the rendering of the real estate services." <u>Id</u>.

14

¶ 36. The court construed the phrase "by reason of any act, error or omission in real estate professional services rendered" to indicate "that the claims made against the insureds by the underlying plaintiff must be made because of an act, error, or omission in the insured's performance or rendering of real estate services." Id. at 1079 (alteration omitted). In other words, "[t]here must be a direct, causal relationship between the insured's performance of real estate services and the underlying claims made against the insured in order for the claims to be covered under these policies at issue." Id.

¶ 37. The court found it clear that the allegations in the underlying suit did not "arise or result because of the insureds' performance of real estate services." Id. "Essentially," the court explained, the complaint "allege[d] that the insureds committed intentional business torts and engaged in unfair competitive practices." Id. "The risk of conducting one's business in an unfair and tortious manner," the court concluded, "is certainly not one inherent in the practice of the real estate profession." Id. Although the complaint contained allegations that "refer[red] to real estate matters such as listings and commissions," these allegations went "to the injury or damage done to Dependable and which resulted from the insureds' allegedly tortious conduct;" they did not "form the genesis from which the claims made by Dependable first arose." Id.

¶ 38. Construing the E&O policy to cover such claims, the court concluded, "would expand the coverage beyond what was contracted for by the parties" and "[t]he insureds' interpretation of these policies could not have been reasonably contemplated by the parties when they entered into these insurance contracts." Id. Thus, because the facts alleged in the complaint did "not fall potentially within the coverage afforded by the policies," the insurer had no duty to defend. Id.

¶ 39. ITI fails to meaningfully distinguish this case. It contends that, unlike the case above, the GOAD complaint alleged "acts that only a consultant, engineer and/or construction manager in the [ITI] line of specialized work could undertake." One could make this argument in

15

any professional liability case. One could argue in the <u>Crum</u> case, for example, that only a real estate professional would know how to set up a competing real estate office, lure employees to its office, induce others to list real estate with the new company, steal clients, and use trade secrets, or, in <u>Massamont</u>, that coverage must be provided because only an insurer would be able to solicit insurance, which happened to breach an exclusivity clause.

¶ 40. This logic would transform the E&O policy into a comprehensive liability policy. It ignores the requirement of a direct causal link between ITI's performance of professional services and the underlying claim made against ITI. <u>Id</u>. Like the policy discussed above, the policy here obligates Crum to pay damages "because of" and "resulting from" a wrongful act; it is not enough to show "an act flowing from mere employment or vocation." <u>Massamont</u>, 489 F.3d at 74 (quotation omitted). The policy language cannot be construed so broadly as to encompass the alleged conduct here. It does not cover "[t]he risk of conducting one's business in an unfair and tortious manner." <u>Crum</u>, 620 N.E.2d at 1079; see also <u>Shelton</u>, 507 So. 2d at 896-97 (concluding that "fraudulent statements made to induce entry into a contract of employment do not fit within the coverage of a 'professional services' liability policy").

¶ 41. We are equally unpersuaded by ITI's reliance on <u>Utica Mut. Ins. Co.</u>, 820 F.3d 36, in support of its claim of coverage. In <u>Utica</u>, the court reiterated that "[t]he touchstone for professional services coverage is whether the alleged wrongful act or omission is inherent in the practice of the profession," and "[t]hus, professional liability policies generally do not cover . . . business management activities, business decisions of a nonprofessional nature, activities not requiring professional expertise, or activities totally unrelated to the profession." <u>Id</u>. at 42. Like the <u>Massamont</u> court, it reasoned that "[w]hile these other acts may 'set the stage' for the performance of professional services, they are not themselves professional services and thus are not covered by most professional liability policies." <u>Id</u>.

16

¶ 42.   The court distinguished "professional services" from "ordinary business activities common to other professions—such as renting a building, purchasing supplies, charging fees, hiring employees, or contracting to expand one's business." Id. It specifically identified business decisions of a nonprofessional nature to include "violating a contract in order to procure a business advantage, or stealing trade secrets or other property." Id. at 43 (citation omitted). These types of acts, the court explained, require no knowledge or skill particular to the profession.

¶ 43.   Against this backdrop, the court considered an underlying dispute between Landy, the insured, which was also an insurance company, and CRES, one of its competitors in the California real estate professional-liability-insurance market. CRES alleged "that Landy had engaged in unfair business practices in violation of California state law." Id. at 39. More specifically, it complained that Landy "improperly offered surplus insurers' policies despite the adequacy of the admitted market." Id. CRES raised a negligence claim against Landy, "alleging that Landy's conduct negligently interfered with CRES's prospective economic advantage," and specifically, "that Landy failed to act with reasonable care . . . in the solicitation and placement of insurance policies," and that it "failed to conduct a diligent search of the admitted market, filed falsified documentation relating to the search, and evaded scrutiny by failing to file required statements." Id. at 40 (quotations and alterations omitted).

¶ 44.   The court concluded that the allegations were covered by an E&O policy that covered "suits arising from Landy's errors or omissions in 'rendering or failing to render professional services' as an insurance broker or insurance agent." Id. It determined that the alleged activities—"soliciting and placing insurance policies, searching the admitted market, and filing related documentation—[were] part of the professional activity of an insurance agent or broker." Id. at 43. The court found these activities unique to insurance professionals rather than "ordinary business activities common to other professions," and it distinguished them from "business decisions of a non-professional nature, such as violating a contract in order to procure a business

17

advantage, or stealing trade secrets or other property." Id. (citation omitted). The court acknowledged that, naturally, "some professional decisions also affect business practices," and concluded that "Landy's allegedly unfair business practices derive[d] from alleged errors in the performance of professional services: negligent solicitation and placement of insurance policies and failure to conduct due diligence into the admitted insurance market." Id. at 44.

¶ 45. The allegations in the instant case are nothing like those involved in Utica. As discussed above, GOAD alleged that ITI intentionally sought, through misrepresentations and other bad conduct, to undermine and replace GOAD as the subcontractor on the Project. This alleged behavior was not an "act, error, or omission in the rendering . . . [of] professional services" by ITI. Common sense dictates this conclusion and "a reasonably prudent person applying for insurance" would not have expected otherwise. Coop. Ins. Cos., 2012 VT 22, ¶ 9; see Roe v. Fed. Ins. Co., 587 N.E.2d 214, 217 (Mass. 1992) ("Common sense, of course, will always provide a useful guide in differentiating covered from uncovered case.").

¶ 46. Finally, we are unpersuaded by ITI's reliance on two cases that involve general business liability policies that contained exclusions for "any service of a professional nature." Erie Ins. Grp. v. All. Envtl., Inc., 921 F. Supp. 537, 541 (S.D. Ind. 1996); see also Hurst-Rosche Eng'rs., Inc. v. Commercial Union Ins. Co., 51 F.3d 1336, 1343 (7th Cir. 1995). As the Erie court made clear, there is a significant difference between " 'an errors and omissions' policy or a professional malpractice policy" and "a general business liability policy that expressly excludes coverage for liability for 'damages due to . . . any service of a professional nature." 921 F. Supp. at 541. This difference "is important in terms of what the parties to the insurance contract believe that they are buying and selling." Id. "Where the entity buying a general liability policy is in the business of providing professional services . . . there is some room for confusion, overlap, and controversy." Id. These courts considered "what scope to give the phrase 'due to service of a professional nature,' " in a general liability policy and we do not find them helpful here. Id.

18

¶ 47. GOAD's injurious-falsehood claim likewise rests not on a claim of sub-par project management services to Honeywell (or any other client), but, rather, hinges on ITI's alleged false statements about GOAD.

¶ 48. In its complaint, GOAD alleged that "ITI communicated—published—false statements to Honeywell that GOAD's work was not industry standard[,] that GOAD's technical requirements for the plating process improvements did not reflect best practices, that GOAD was seeking to expand the scope of its work, and that GOAD's proposals did not conform to the Army's specifications, among other things." It alleged that ITI "intended for these statements to result in pecuniary harm to GOAD" by leading or contributing to GOAD's removal from its role on the Project, or alternatively, that ITI "recognized or should have recognized that its false statements would result in this pecuniary harm to GOAD." According to GOAD, ITI "knew that these statements were false or acted with reckless disregard of their truth or falsity" and that "[i]n communicating these injurious falsehoods to Honeywell, ITI committed intentional wanton, willful, and outrageous acts without justification, or acted with reckless disregard for GOAD's rights."

¶ 49. The crux of GOAD's complaint is that ITI "pulled a bait and switch by convincing Honeywell to remove GOAD," through various improper means, "so that ITI could increase the scope of its own role at Honeywell's expense" and at GOAD's expense. Although ITI's provision of professional consulting services provided the backdrop for its alleged publication of injurious falsehoods, the gravamen of GOAD's claim is a tortious injury to GOAD, not malpractice in the provision of consulting services.

¶ 50. We find no coverage for these factual allegations for the same reason we found no coverage for the allegations related to the tortious-interference-with-business-relationship claim. The policy does not cover the risk of intentionally making false representations to undermine a competitor. Allegedly lying to Honeywell to better position itself is not a "function" that ITI

19

"performed for others" that is "related to" the provision of professional engineering or consulting services. The court did not err in concluding that Crum had no duty to defend ITI against the GOAD suit.

¶ 51. Having found no breach of the duty to defend, we do not address ITI's assertion that Crum should be liable for the reasonable costs of its defense and settlement with GOAD.

Affirmed.

FOR THE COURT:

_____

Associate Justice