*Citizens Ins. Co. v. Vt. Sch. Bd. Ins. Trust*, No. 333-6-19 Wncv (Tomasi, J., Feb. 6, 2020).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## VERMONT SUPERIOR COURT

SUPERIOR COURT
Washington Unit

CIVIL DIVISION
Docket No. 333-6-19 Wncv

| | |
|---|---|
| Citizens Insurance Co. of America<br>  Plaintiff<br><br> v.<br><br>Vermont School Board Insurance<br>Trust, Inc., and Catlin Indemnity<br>Company<br>  Defendants | |

Opinion and Order on Catlin's Motion to Dismiss

This is an insurance coverage dispute among potentially liable insurance providers arising out of an ongoing tort suit currently pending in Franklin Superior Court. In that case, Mr. Andrew M. Douglas alleges that while a student at the Missisquoi Valley School, part of the Franklin Northwest Supervisory Union (Franklin), he was attacked and severely injured by another student, M.F. The attack allegedly was enabled by Franklin's negligent supervision. Mr. Douglas further alleges that he suffered from resulting traumatic brain injury and post-traumatic stress that Franklin discriminated and retaliated against him in violation of the Vermont Fair Housing and Public Accommodations Act ("VFHPAA"), 9 V.S.A. §§ 4500–4507, by persistently failing to adopt or employ an effective "safety plan," otherwise successfully managing school-related contacts between Mr. Douglas and M.F., and taking punitive actions against Mr. Douglas.

The attack on Mr. Douglas occurred in October 2012. Plaintiff Citizens

Insurance Co. of America ("Citizens") provided commercial general liability (CGL)

coverage to Franklin for the July 1, 2012 to July 1, 2013 policy year (the year of the

attack). Defendant Catlin Indemnity Company ("Catlin") provided CGL coverage to

Franklin for the July 1, 2013 to July 1, 2014 and July 1, 2014 to July 1, 2015 policy

years. Thereafter, Franklin has been insured by Defendant Vermont School Board

Insurance Trust, Inc. ("VSBIT"). Citizens claims that Catlin has denied coverage to

Franklin, and refused to provide a defense, taking the position that the attack

(negligent supervision) predates its policies and the events of discrimination and

retaliation postdate its policies.[1] Citizens seeks a declaration that Catlin has duties

to defend and indemnify Franklin in the tort litigation.[2]

Catlin has filed a Rule 12(b)(6) motion to dismiss the claim against it.[3] It

argues that, based on the allegations of the tort complaint, it can have no duty to

_____

[1] Catlin's motion does not address Citizens' claim against VSBIT, which has not
participated in the briefing.

[2] In other words, in this action, Citizens is attempting to compel Catlin (and VSBIT)
to share defense and indemnity costs with it in the tort suit. Citizens presumably
already is providing a defense on its own. Neither Mr. Douglas nor Franklin is a
party to this case, and no party has objected to their absence here.

[3] Catlin's motion might have been more properly framed as seeking judgment on the
pleadings, Vt. R. Civ. P. 12(c), or summary judgment, Vt. R. Civ. P. 56. Generally,
the question presented by a Rule 12(b)(6) motion is whether the complaint
sufficiently states a claim. The issue presented by Catlin's motion is not whether
Citizens' complaint states a claim in the narrow sense, but whether as a matter of
law based on the underlying tort complaint and the Catlin policies, Catlin's duty to
defend has been triggered. In any event, the issue is a legal one, Citizens has not
objected that the motion is improperly framed under Rule 12(b)(6), and no prejudice

2

defend or indemnify because all alleged tortious conduct occurred before or after its coverage period. Citizens argues that the complaint can be reasonably read to allege bodily injury occurring within the Catlin coverage period, or at least the complaint does not rule out such timing, and thus Catlin at least has a duty to defend.

The Catlin policies provide "occurrence-based" coverage for bodily injury occurring during the policy period.[4] *See* Catlin CGL Policies §§ I.A.1.b(1)–(2). Each defines occurrence, generally, as an "accident." *Id.* §§ V(13); *see generally N. Sec. Ins. Co. v. Perron*, 172 Vt. 204 (2001) (discussing the meaning of "accident"). Each requires Catlin to defend Franklin against such claims. Catlin CGL Policies. §§ I.A.1.a. There are no current disputes about the operative policy language, any exclusions, or whether the tort complaint in fact describes occurrences. The controversy presented boils down to one of timing: whether the allegations of the tort complaint can be fairly read to describe an occurrence within the Catlin policy periods.

I. *The Standard*

The Vermont Supreme Court has described the standards applicable to the determination of the duty to defend as follows:

to any party is apparent. The Court will, therefore, rule on the legal issue as presented.

[4] Franklin also had Educators Legal Liability (ELL) and Educators Excess Liability (Excess) policies with Catlin. However, the ELL policies are claims-made and there appears to have been no claim for coverage under them. The Excess policies "follow form" and thus do not need to be analyzed separately from the CGL policies.

> Insurers have a duty to defend when the claim against the insured "might be of the type covered by the policy." In determining whether there is a duty to defend, we compare the language of the policy to the language of the complaint. The most expansive duty under insurance liability policies is the insurer's duty to defend, but there is no duty to defend when there is no possible factual or legal basis on which the insurer might be required to indemnify.

*Co-operative Ins. Companies v. Woodward*, 2012 VT 22, ¶ 10, 191 Vt. 348, 353 (citations omitted). "It 'is the actual complaint, not some hypothetical version, that must be considered.'" *Integrated Technologies, Inc. v. Crum & Forster Specialty Ins. Co.*, 2019 VT 53, ¶ 22, 217 A.3d 528, 535.

II. *The Facts*

There is no dispute that the October 2012 attack and immediate physical injury occurred well before the Catlin coverage period. Citizens reads the tort complaint potentially to assert that injuries related to negligent supervision consisted of the attack itself *and* potentially subsequent events occurring during the Catlin coverage period (July 1, 2013 – July 1, 2015). It also interprets the complaint as potentially describing events giving rise to the discrimination and retaliation claims during the coverage period. To the extent that the complaint is unclear on when specific events may have occurred, Citizens urges an interpretation triggering Catlin's duty to defend.

The instant tort complaint is detailed, chronological, and includes express allegations of timing that are material to the issue presented in this case. *See* Vt. R. Civ. P. 9(f) ("For the purpose of testing the sufficiency of a pleading, averments of

4

time and place are material and shall be considered like all other averments of material matter.").

### A. *Facts Predating Coverage Period, Before July 1, 2013*

According to the complaint, M.F. intimidated and then violently attacked Mr. Douglas on October 29, 2012 on school grounds between classes. There was no adult supervision of any kind provided by the school when this happened. Prior to the attack, Mr. Douglas "flourished . . . academically, socially, and athletically" at school. Tort Complaint 2. His pediatrician diagnosed him the following day with a concussion. "His left temple was . . . black and blue. [He] had a temporary loss of almost all memory and could not attend school for more than a couple hours [per day]. He did not return to class full-time until mid-December 15, 2012, but then often had to take half days when he got bad headaches and to attend doctor's appointments." *Id*. at 4. This is the only physical attack alleged in the tort suit.

Mr. Douglas's parents were dissatisfied that, in relation to the severity of the harm to Mr. Douglas, the school only imposed a scant three-day suspension on M.F. (one of which was a snow day) for what the school resource officer characterized as "the offense of aggravated assault." *Id*.

Thereafter, the school took steps to keep Mr. Douglas and M.F. apart while at school, including removing each from a class, barring M.F. from Mr. Douglas's hall and from a school dance, among other actions. Mr. Douglas's parents took the position that M.F. should be completely barred from the entire campus. Whenever

5

Mr. Douglas saw M.F., his symptoms would worsen and he would become fearful and anxious.

Certain of Mr. Douglas's symptoms did not get better with time. "His memory and cognitive function slowly improved, but he continued to have an occasional inability to filter his speech. He was also diagnosed with a [TBI] that caused . . . chronic debilitating and migraine-like headaches, seizures, and loss of consciousness. His medical providers also diagnosed [him] with a cyst on the back of his brain from the attack, which diagnosis means that another blow to the head could be fatal." *Id.* at 5. He also experienced "depression, anxiety, occasional suicidal thoughts, and regular nightmares of the attack." *Id.*

B. *Facts During Coverage Period, July 1, 2013 – July 1, 2015*

The following schoolyear (2013 – 2014), M.F. attended a different school, Enosburg High School. *Id.* at 6. Mr. Douglas's school, in concert with his parents, developed and adopted a "Section 504 plan" to accommodate his disabilities. Recommendations from the Stern Center for Language and Learning were incorporated into it. During this school year, Mr. Douglas's symptoms improved but at an "extremely slow" rate. *Id.* at 6.

The next schoolyear (2014 – 2015), M.F. attended an alternative school called NOVA. She was on Mr. Douglas's campus only at the end of schooldays for drop-offs and pickups, all supervised by adults. *Id.* Mr. Douglas "and his parents were not happy that she would be on the campus at all, but they dealt with it." *Id.* Following a juvenile court-ordered plan applying to M.F., the specifics of which were not

shared with Mr. Douglas or his parents, the school superintendent told Mr. Douglas and his parents that he would never have to see M.F. again, except at graduation. "With M.F. absent from the school campus, Andrew saw success academically and socially, although he continued to struggle with his TBI symptoms. . . . He had his physical challenges, but overall it was a good year. *Id.* at 7.

C. *Facts Postdating Coverage Period, After July 1, 2015*

In August 2015, the superintendent unilaterally changed M.F.'s safety plan and advised that M.F. would be returning to Mr. Douglas's school and would be in his immediate proximity during the school day. Such contact with M.F. was "deeply disturbing" to Mr. Douglas, who became a "psychological mess." *Id.* at 8. In October 2015, the superintendent ignored professional criticism of the new plan and told Mr. Douglas to just "get over it." *Id.* at 9. Other school personnel also ignored pleas by professionals trying to advocate for Mr. Douglas and did nothing about the distress the new plan was causing.

Eventually, following mediation, the superintendent and Mr. Douglas's parents agreed to a new safety plan. The superintendent then backed out of it and unilaterally created another new safety plan that imposed restrictions on Mr. Douglas for the benefit of M.F. *Id.* at 10. M.F. violated the new plan on the first day, triggering Mr. Douglas's post-traumatic stress. While Franklin finally agreed to put a more effective safety plan in place, by that time, Mr. Douglas felt compelled to "escape" the school. He applied to and then attended Clarkson University for his senior year. *Id.* at 11.

7

Typically, Franklin would treat such a student as dually enrolled and allow him to participate in certain activities. The administration, however, would not permit Mr. Douglas to participate in a skit on "skit night" with his girlfriend, although they eventually relented and permitted it. *Id.* at 12. The administration additionally made academics especially difficult by requiring Mr. Douglas to take a challenging college-level economics course. Finally, though other dually enrolled students were permitted to attend graduation and the senior prom, Mr. Douglas was not.

III. *Analysis*

The complaint articulates two claims. Count 1 is negligent supervision relating to the immediate events of the attack, and for making changes to the safety plan that put Mr. Douglas at risk of harm. Count 2 is discrimination and retaliation of a student with a disability. This claim relates to the failure to adopt or employ effective safety plans and specific "hostile" actions, such as telling Mr. Douglas to "get over it."

The Vermont Supreme Court has made clear that the "duty to defend is determined by the *factual allegations* of the complaint." *Integrated Technologies, Inc. v. Crum & Forster Specialty Ins. Co.*, 2019 VT 53, ¶ 22 (citation omitted; emphasis added). "It is the *source* from which the plaintiff's . . . injury originates rather than the specific *theories of liability* alleged in the complaint which determines the insurer's duty to defend." *Id.*, 2019 VT 53, ¶ 33 (citation omitted).

8

Each complaint must be assessed on its own allegations. The complaint in this case is especially detailed. It clearly describes the physical attack as occurring well before the inception of the Catlin coverage period. The complaint describes no further physical attacks, whether during the Catlin coverage period or after. The Catlin two-year coverage period aligns exactly with the two schoolyears in which M.F. did not attend school with Mr. Douglas. To the extent that M.F. was present at Mr. Douglas's school at all during those two years, M.F. was supervised for drop-offs and pickups, and there is no indication of any new adverse experiences affecting Mr. Douglas during that time, whether involving M.F. or the school administration.

The complaint then plainly alleges that matters took a turn for the worse with the administration in August 2015. But, those events occurred *after* the end of the Catlin coverage period. The only reasonable interpretation of the "actual complaint, not some hypothetical version" reveals no allegation of bodily injury occurring during the Catlin coverage period.[5]

Citizens' argument that the Court should allow the parties to engage in discovery to determine whether Catlin's coverage is triggered is out of step with Vermont law. That determination is made based on the factual allegations of the tort complaint.

---

[5] At the hearing on December 3, 2019, the Court asked counsel for Catlin how the insurer would respond if the tort–plaintiff were to amend the tort complaint in a manner revealing an occurrence during the Catlin coverage period. Counsel represented that the insurer would have to evaluate the amendment and reconsider the position it has taken thus far with regard to defense and indemnity duties.

In the final arrow of its quiver, Citizens asked the Court to employ a "continuous trigger" analysis. Per that analysis, Citizens argues that the complaint may describe continuously occurring bodily injuries that could trigger multiple policies, including Catlin's. While the Vermont Supreme Court has applied the continuous trigger test in the specialized context of environmental pollution, *see, e.g., Towns v. Northern Sec. Ins. Co.*, 2008 VT 98, ¶ 31, 184 Vt. 322, 344 (2008), it has never done so in the case of ordinary personal injuries. Citizens offers no analysis in support of applying the continuous trigger test in a case such as this, where conventional insurance law is wholly sufficient to analyze Catlin's duty of defense. There is no arguable need for the continuous trigger test in this case and the Court declines to adopt it in these circumstances.

The present tort complaint does not trigger Catlin's duty to defend.

### Order

For the foregoing reasons, Catlin's motion to dismiss is granted to the effect that Citizens is not entitled to a declaratory judgment that Catlin has a duty to defend in the Franklin tort suit.

Dated this __ day of February 2020 at Montpelier, Vermont.

_____
Timothy B. Tomasi,
Superior Court Judge

10